George BASIARDANES,
Plaintiff-Appellant,

v.

CITY OF GALVESTON,
Defendant-Appellee.

No. 81–2239.

United States Court of Appeals,
Fifth Circuit.

Aug. 19, 1982.

Matthew Horowitz, Univ. of Conn. School of Law, Hartford, Conn., for plaintiff-appellant.

Robert V. Shattuck, Jr., City Atty., Galveston, Tex., for defendant-appellee.

Before GARZA, POLITZ and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case presents a First Amendment and Due Process challenge to a zoning ordinance that is so broad it effectively bans the showing of nonobscene but sexually oriented motion pictures at adult theaters within the City of Galveston. George Basiardanes, a property owner in Galveston, leased his building for the showing of adult films. Galveston then passed a zoning ordinance that prohibited Basiardanes from using his building for this purpose. After the Galveston adult theater ordinance frustrated his plans to house an adult theater in his building, Basiardanes brought this suit, claiming that the ordinance had the effect

of zoning adult theaters out of the city and thereby constituted a prior restraint of protected speech. Basiardanes also challenged the ordinance on vagueness grounds.

The district court held that Basiardanes lacked standing to challenge certain provisions of the ordinance and upheld the others against constitutional attack. 514 F.Supp. 975 (S.D.Tex.1981). Specifically, the district court held that the ordinance did not constitute a prior restraint even though it excluded adult theaters, as defined in the ordinance, from 85% of Galveston and perhaps from all practicable locations in the City. Basiardanes appeals from this judgment. Finding that the ordinance does infringe protected speech and that the district court erred in its denial of standing on one issue although it was correct on others, we reverse in part and remand.

## I. The Zoning Ordinance

The City of Galveston lies on an island on the Gulf Coast of Texas. Sixty thousand people have chosen to make their homes in Galveston, the area of which is approximately 52 square miles. The City is a popular resort and enjoys a large volume of tourist traffic especially during the warmer months.

In 1970, George Basiardanes acquired a three-story building in the downtown Galveston business district. Initially, he opened a sandwich shop and pool hall on the ground floor, and rented out the rooms on the upper two floors to individual tenants. During the 1970s, however, Galveston's downtown business district suffered the decline that has afflicted many American cities. Because fewer and fewer people came downtown, the pool hall's business dropped off. In 1977, Basiardanes decided to sell his building, or, failing a buyer, lease it to a business tenant.

Basiardanes' leasing efforts evoked a response from a movie concern called Universal Amusements Company. Universal Amusements entered into an oral contract with Basiardanes to lease part of the ground floor to show nonobscene adult motion pictures. Basiardanes agreed to remodel the building for that purpose. To herald the arrival of his new tenant, Basiardanes put a sign on the building reading "Adult Theater."

Basiardanes' enthusiasm for his new venture was not shared by Galveston city officials. The proposed theater lay across the street from a major renovation of the City's Grand Opera House. The city government feared that the presence of an adult theater so close to the opera house would deter families from patronizing the historic opera house and thereby impede the upgrading of the area. Moreover, the City apparently believed that a nexus existed between adult theaters and crime. Downtown adult theaters, according to the City, threatened its effort to reduce the crime rate in that area. Thus, when Galveston got wind of Basiardanes' plans, the city government quickly moved to block the opening of an adult theater in Basiardanes' building.

The City's first action was to pass a moratorium on downtown building permits. The moratorium thwarted Basiardanes' efforts to convert the ground floor of his building to a theater. Shortly after the moratorium was passed, the City erected an even higher barrier to Basiardanes' plan to open an adult theater. The City passed Ordinance 78–1, which comprehensively regulates the location of adult theaters and adult bookstores.[1] That ordinance is the subject of this suit.

The ordinance keys its definition of adult motion picture theaters to Texas law. Under the ordinance, an adult motion picture theater is one "from which, under the laws of the State of Texas, minors are excluded by virtue of age unless accompanied by a consenting parent, guardian or spouse."[2]

---

1. The ordinance is set out as an appendix to the district court's opinion, reported in 514 F.Supp. at 983–85.

2. The Texas Penal Code, Article 43.24 V.T.C.A. (1974), makes it an offense knowingly to sell to an individual younger than 17 material:

... whose dominant theme taken as a whole:

The ordinance applies to all theaters that regularly show movies that Texas prohibits minors from viewing without parental permission. It is not limited to theaters that show obscene movies or even blatantly sexual but nonobscene movies.

Ordinance 78–1 restricts adult movie theaters to areas zoned for three uses: central business, light industry, and heavy industry. Residential areas are off-limits altogether. Within the business and industrial areas, the ordinance disperses adult theaters in three ways. First, a theater must be more than 500 feet from an area zoned residential, or from any two, or any combination of two, "pool halls, liquor stores, or bars." Second, an adult theater must be more than 1,000 feet from another adult theater or adult bookstore. Third, an adult theater must be more than 1,000 feet from any "church, school, public park, or recreational facility where minors congregate."

These dispersal requirements result in excluding adult theaters from 80% to 90% of the three areas from which they are not flatly banned, including all of the central business district. The only conceivable remaining locations are in the areas zoned for light and heavy industry. The industrial zones, however, are largely a patchwork of swamps, warehouses, and railroad tracks. They also lack access roads and retail establishments.

Further, even for those locations not barred by the dispersal requirements, a special permit must be obtained to show adult films. Under the ordinance, the City may grant a permit only if it finds: (1) that the theater is not contrary to the public interest or injurious to adjacent properties, (2) that the theater will not enlarge or promote a "skid row" area, (3) that the theater will not interfere with a neighborhood conservation or revitalization program, and (4) that all zoning laws will be observed.

The ordinance also regulates the on-site advertising of adult theaters. The ordi-nance prohibits any advertising or displays for an adult bookstore or theater that are visible to the public from any street, sidewalk, or other public place. No other commercial establishments are similarly regulated.

Basiardanes had been forced to discontinue renovation of his building when the City first passed the building-permit moratorium. Simultaneously, the City had pressured Basiardanes to remove his sign announcing the imminent arrival of adult movies to his premises. Ordinance 78–1 then dealt a fatal blow to Basiardanes' plans for presenting adult entertainment in Galveston. Deprived of the revenues from his lease, Basiardanes contracted to sell his building and brought suit for an injunction and damages against the City under 42 U.S.C. § 1983 claiming a violation of his rights under the First and Fourteenth Amendments. After a trial, the district court upheld the constitutionality of Ordinance 78–1 insofar as Basiardanes was held to have standing to question its validity.

## II. Vagueness

Basiardanes challenges several portions of Ordinance 78–1 for vagueness. The ordinance regulates "adult theaters." Basiardanes contends that the term "adult theater" is unduly imprecise because the definition applies to theaters showing adult films "on a regular basis" but fails to define "regular basis." He also finds imprecision in an exception from the definition of adult theater for "schools" and "public auditoriums." In addition, the dispersal sections of Ordinance 78–1 contain several terms that Basiardanes finds vague. Adult theaters may not be located within specified distances of churches, schools, parks, "recreational facilities where youths congregate," bars, or other adult theaters. Basiardanes contends that each of these words has uncertain meaning.

 Laws that are unconstitutionally vague fall because persons who must con-

(A) appeals to the prurient interest of a minor, in sex, nudity, or excretion;
(B) is patently offensive to prevailing standards in the adult community as a whole

with respect to what is suitable for minors; and
(C) is utterly without redeeming social value for minors.

form their conduct to the law are entitled to fair notice of what is permitted and proscribed. *Village of Hoffman Estates v. Flipside, Hoffman Estates,* —— U.S. ——, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Fernandes v. Limmer,* 663 F.2d 619, 635 (5th Cir. 1981). Fair notice protects those who might otherwise stray into the regulated area, prescribes standards for law enforcers, and preserves legitimate activity against the chill that flows from a law of uncertain scope. *Grayned,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99.

■ Basiardanes challenges the Galveston ordinance as vague on its face. A law is facially vague if its terms are so loose and obscure that they cannot be clearly applied in any context. Such a "law is incapable of any valid application," *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974), because it does not provide any standards against which one's conduct may be measured. *Smith v. Goguen,* 415 U.S. 566, 578, 94 S.Ct. 1242, 1249–50, 39 L.Ed.2d 605 (1974).

■ The terms of the Galveston ordinance, however, are not vague as applied to Basiardanes himself. Trial testimony established that Basiardanes knew that the theater he proposed to house would show adult movies within the meaning of the ordinance. Moreover, Basiardanes conceded that his building lay within two blocks of a church and within 500 feet of nearly a dozen bars. Thus, Basiardanes' facial challenge to the ordinance must fail because the terms of the ordinance clearly apply to his own building.

■ Basiardanes nevertheless claims that he has standing to challenge the ordinance on grounds that it is vague as applied to others. Ordinarily, a litigant to whom a statute clearly applies lacks standing to argue that the statute is vague as to others. In the First Amendment context, however, courts have relaxed the general rule against standing to raise the rights of third parties.

Under *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), a litigant may assert the First Amendment rights of others when the effect of a vague ordinance on legitimate expression is real and substantial and the language of the ordinance is not readily subject to a narrowing construction by state courts. 427 U.S. at 60, 96 S.Ct. at 2447 (plurality opinion); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).

*American Mini Theatres* concerned a zoning ordinance that regulated movies "characterized by an emphasis" on certain bodily parts and sexual activities. A theater operator maintained that it had standing to argue that the ordinance was unconstitutionally vague as applied to other theaters, even though the ordinance was clearly applicable to it. The alleged vagueness was in how much emphasis on the specified bodily parts and activities the ordinance required before a film became subject to regulation. The Court denied that this vagueness issue posed a sufficient threat to protected speech to warrant third party standing. "For most films, the question will be readily answerable; to the extent that an area of doubt exists, we see no reason why the ordinances are not 'readily subject to a narrowing construction by the state courts'" 427 U.S. at 60, 96 S.Ct. at 2447.

■ Under *American Mini Theatres,* Basiardanes' contention that the Galveston ordinance is vague as applied to other theater operators fails to warrant third party standing. Basiardanes argues that the Galveston ordinance applies to theaters showing adult films on a "regular basis," and that it is unclear what "regular basis" means. We find no real and substantial ambiguity here, and to the extent that "regular" is vague, state courts may clarify it without insuperable difficulty. Similarly, the other terms challenged by Basiardanes, such as "church" and "school," have such narrow areas of vague application that we see no pressing need to adjudicate the

rights of parties not before the court.[3] Whether these terms are unconstitutionally vague may be decided when one aggrieved by their imprecision chooses to challenge them.

Basiardanes also argues that he has standing to make his vagueness challenge in his capacity as a movie viewer. He claims that Ordinance 78–1's vagueness intimidates movie theaters and deters them from showing adult films. He seeks injunctive relief against the ordinance to grant him his right to view adult films free from the inhibition of the ordinance.

 The First Amendment protects the right to hear as well as to speak. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). An ordinance that silences a willing speaker, therefore, also works a constitutional injury against the hearer. In *Virginia State Board*, the Supreme Court upheld the right of consumers to challenge a Virginia statute that restrained the freedom of phar-

macists to advertise the prices of prescription drugs. The Court stated that "[f]reedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection is afforded to the communication, to its source and recipients both." 425 U.S. at 756, 96 S.Ct. at 1823 (footnote omitted).[4]

 Although consumers do have the standing to challenge limitations on the exercise of speech in proper circumstances, on this record we find that Basiardanes lacks standing in his capacity as a moviegoer. Recipients of protected communication have standing only if there is a speaker who wishes to express himself or herself. *Virginia State Board*, 425 U.S. at 754, 96 S.Ct. at 1821–22. The record here fails to disclose the existence of a willing speaker affected by the ordinance, other than Basiardanes. Although several witnesses testified that Galveston's market could support an additional adult theater, none testified that he would open such a theater but for Ordinance 78–1.[5] In the absence of a willing

---

**3.** *Cf. Stansberry v. Holmes*, 613 F.2d 1285, 1289–1290 (5th Cir. 1980) (holding that the terms "school" and "sexually oriented commercial enterprise" were not impermissibly vague when read in light of limiting conditions in the statute), *cert. denied*, 449 U.S. 886, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980).

**4.** The Third Circuit has held that recipients of protected speech have standing to challenge restraints on speech only if the speaker himself is precluded from making the challenge. *Frissell v. Rizzo*, 597 F.2d 840, 848 (3d Cir. 1979), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). In *Frissell*, the plaintiff was a newspaper reader who alleged that the mayor of Philadelphia had withdrawn city advertising from local newspapers and thereby chilled the exercise of First Amendment rights. The Third Circuit acknowledged that newspaper readers' First Amendment rights were at stake. Nevertheless, the court held, on prudential grounds, that only the newspapers themselves could complain of the mayor's action.

The *Frissell* court attempted to square its reasoning with *Virginia State Board* by arguing that the restrictions on pharmacists' advertising in that case created a "pharmacists' cartel, sheltered from competition, which sharply reduced the incentive for any individual pharmacist to oppose the regulations." 597 F.2d at 849. According to the Third Circuit, consumers were proper parties to litigate the restric-

tions on pharmacists' price advertising only because pharmacists themselves had little incentive to do so.

We must reject this narrow view of *Virginia State Board*. Not only does the *Frissell* court's view on standing appear nowhere in the Supreme Court's opinion, it also contradicts economic experience. Restraints on price advertising create entry barriers to new arrivals in the market. Advertising enables these new entrants to gain a foothold in an otherwise closed marketplace. Pharmacists who are fresh in a community would have every incentive to challenge an advertising ban. We are unwilling to assume that pharmacists are more timid than lawyers in this regard, *see In Re R. M. J.*, —— U.S. ——, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (challenge by an attorney to advertising restraints); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (same). In our view, *Virginia State Board*'s holding on consumer standing may not be limited to situations in which the speaker is prevented from raising the First Amendment question.

**5.** Only two witnesses in the theater business testified at trial. Neither expressed an intent to open a new theater. James Ohmart, Vice-President of Theaters West, Inc., testified that his company had no plans to open a new adult theater in Galveston because a new theater

speaker, we reject Basiardanes' argument that he has standing to request injunctive relief in the capacity as a movie viewer. Thus, other than to hold that Ordinance 78–1 is not vague on its face, we do not reach the merits of Basiardanes' vagueness challenge.

### III. Restriction on Location of Adult Theaters

■ Ordinance 78–1 severely limits the options of one wishing to open an adult theater in Galveston. Basiardanes maintains that the zoning restriction is tantamount to a total ban of additional adult theaters in Galveston in breach of the First Amendment. In Basiardanes' view the locations permitted by the ordinance fall too far short of commercial viability to allow an adult theater to open. The district court rejected Basiardanes' contention, finding that Ordinance 78–1, though it does limit adult theaters to undesirable locations, "strikes at the pocketbook and not at the Constitution." 514 F.Supp. at 982. We hold that the conclusion of the district court is in error. Ordinance 78–1 constitutes a restraint of speech in violation of Basiardanes' First Amendment rights.[6]

■ A city's authority to zone is an integral aspect of its police power. The preservation of residential neighborhoods and business districts against the deteriorating influence of crime and blight surely ranks among the highest functions that city dwellers expect its planners to perform. In recognition of the place of zoning in maintaining and upgrading the quality of life in cities, courts generally adopt a deferential posture towards zoning ordinances, *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct.

2138, 2141, 65 L.Ed.2d 106 (1980); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Stansberry v. Holmes*, 613 F.2d 1285 (5th Cir. 1980). Ordinarily, a zoning regulation will be sustained if it is rationally related to a legitimate state interest and does not extinguish all practicable uses of the property. *Id.*

Different judicial attitudes come into play, however, when zoning schemes intrude upon activity protected by the First Amendment. In *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the Supreme Court struck down on First Amendment grounds a zoning ordinance that prohibited all live entertainment within city limits. Declining to apply a deferential standard of review, the Court stated ". . . when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial governmental interest." *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 336 (5th Cir. 1981) (heightened standard of review applied to a city's denial of a permit to open an abortion clinic). Our first inquiry, therefore, is whether Ordinance 78–1 infringes a protected right under the proper constitutional test.

■ Galveston's regulation of adult theaters plainly implicates First Amendment rights. The ordinance is not limited to movie theaters and bookstores catering to those with an appetite for obscene materials falling outside the protection of the First Amendment, *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Rather, Galveston has chosen to regulate to the point of banning theaters regularly showing any film that, under Texas law,

---

would only compete with an existing theater, the Broadway, to which he supplied adult films. William Butler, the former manager of the Martini Theater in Galveston, testified that the Martini Theater had been affected by the Ordinance and did have an interest in showing adult films while open. He also testified, however, that the theater had closed almost two years before trial. There was no testimony that the Martini intended to reopen.

6. The City argues that Basiardanes lacks standing to challenge Ordinance 78–1's dispersal provisions because Basiardanes sold his downtown building before trial. We reject this argument. Basiardanes claims monetary damages because Ordinance 78–1 denied him lease revenues while he owned the building. The out-of-pocket injury suffices to confer standing upon Basiardanes. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (litigant must have an injury-in-fact).

may not be viewed by minors who are unaccompanied by an adult. A state's power to protect children against exposure to pornography is considerably broader than its power to regulate material produced with and consumed by adults. *New York v. Ferber*, —— U.S. ——, 102 S.Ct. 3348, ——, 73 L.Ed.2d 1113 (1982) (upholding the imposition of criminal penalties on the distribution of child pornography that is not obscene under *Miller, supra*). Cf. *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (government's interest in shielding youths from exposure to indecent language justifies a restraint on broadcasters' freedom of speech). But here the authorities are prohibiting theaters from exhibiting films to adults rather than children. Many movies from which unaccompanied minors may be excluded are constitutionally protected expressions of free speech for adults. *See Ginsberg v. New York*, 390 U.S. 629, 634–37, 88 S.Ct. 1274, 1277–79, 20 L.Ed.2d 195 (1968). Cf. *Pinkus v. United States*, 436 U.S. 293, 297, 98 S.Ct. 1808, 1812, 56 L.Ed.2d 293 (1978) (children are not part of the "community" by whose standards a work may be found obscene for adults under 18 U.S.C. § 1461). By pegging its definition of adult theaters to Texas law on obscenity for minors, Galveston's regulation of adult theaters sweeps broadly into the area protected by the First Amendment.

 Galveston argues that there is no restriction of First Amendment rights in this case because the ordinance simply regulates the time, place, and manner of the operation of adult theaters.[7] A reasonable time, place, and manner regulation restricts speech but leaves open adequate alternative channels of communication to the speaker. Such a regulation does not violate the First Amendment. *Heffron v. ISKCON*, 452 U.S. 640, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981); *Schad*, 101 S.Ct. at 2186; *Kovacs v. Cooper*, 336 U.S. 77, 85–87, 69 S.Ct. 448, 452–53, 93 L.Ed. 513 (1949). In support of its argument that Ordinance 78–1 leaves open adequate alternative channels, Galveston relies on *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). A comparison of the cases reveals that this reliance is misplaced.

In *American Mini Theatres*, the Supreme Court upheld a zoning ordinance that dispersed adult theaters throughout the city. An adult theater in Detroit could not operate within 1,000 feet of any other adult theater or other regulated use.[8] The Supreme Court found no constitutional infirmity in the application of Detroit's zoning law to adult theaters. The Court rejected an argument that the dispersal requirements alone muzzled protected speech. 427 U.S. at 62–63, 96 S.Ct. at 2448–49.

Galveston argues that *American Mini Theatres* establishes the constitutionality of its own zoning ordinance because Galveston modeled its law on the Detroit ordinance approved by the Supreme Court. Although Galveston is not alone in patterning a restriction on adult theaters on Detroit's dispersal ordinance,[9] merely mimicking the ordinance upheld in *American Mini Theatres* is not enough. Galveston asks us to overlook the overriding fact that the *American Mini Theatres* ordinance did not substantially exclude adult theaters from the city or significantly cut down on viewers' access to adult movies. *See* 427 U.S. at 62, 96

---

**7.** Were we to agree that Ordinance 78–1 is merely a time, place, and manner regulation, we would not apply the strict scrutiny test of *Schad v. Borough of Mount Ephraim, supra*. See *Globe Newspaper Co. v. Superior Court*, —— U.S. ——, —— n.17, 102 S.Ct. 2613, 2620 n.17, 73 L.Ed.2d 248 (1982).

**8.** The regulation of adult theaters was part and parcel of an Anti-Skid Row Ordinance by which Detroit strived to prevent the concentration of businesses deemed likely to cause deterioration of adjacent areas. The other regulat-

ed uses included cabarets, establishments selling liquor, motels, pool halls, pawn shops, and shoeshine parlors. See *American Mini Theatres*, 427 U.S. at 53 n.3, 96 S.Ct. at 2444 n.3.

**9.** *See* Note, Developments in the Law—Zoning, 91 Harv.L.Rev. 1427, 1557 (1978) ("In the wake of Mini Theatres, many municipalities enacted pornography zoning laws, usually imitating Detroit by requiring adult business to be dispersed").

S.Ct. at 2448 (plurality opinion).[10] The Court expressly recognized that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." 427 U.S. at 71 n.35, 96 S.Ct. at 2453 n.35. *See Schad v. Borough of Mount Ephraim*, 101 S.Ct. at 2184, 2186 (noting that *American Mini Theatres* is limited to ordinances that while regulating nevertheless preserve access to protected speech). In contrast, Galveston has enacted a law that bans such theaters rather than disperses them. The law has the precise effect of suppressing speech that the Supreme Court recognized would create a different issue than was faced in *American Mini Theatres* itself.

The Galveston ordinance bans adult theaters outright from much of the city. The remaining areas of the city are off-limits if too close to certain structures such as churches, schools, and residential areas. Basiardanes introduced maps of the city in evidence showing what oppressive options remained to an aspiring promoter of adult films.[11] In the ten percent to fifteen percent of the city not categorically banned, adult theaters may operate only in the industrial zones at a great distance from other consumer-oriented establishments. Few access roads lead to the permitted locations, which are found among warehouses, shipyards, undeveloped areas, and swamps. These locations are poorly lit, barren of structures suitable for showing films, and perhaps unsafe. In theory they are available to adult movie proprietors and patrons, but in fact they are completely unsuited to this use.

 The district court held that as long as some space within the city limits of Galveston is available for adult movie theaters,

the unattractiveness of those locations is irrelevant. The court viewed the drawbacks of opening a movie theater in an industrial zone as simply the "reasonable economic burden that befalls some activity in every land-use program." 514 F.Supp. at 982 (footnote omitted). A tolerance of economic burden is appropriate in judging zoning ordinance that has no impact on protected speech. But when a claim of suppression of speech is raised, an exclusive focus on economic impact is improper. "The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression." *American Mini Theatres*, 427 U.S. at 78, 96 S.Ct. at 2456 (Powell, J., concurring).

 The effect of Ordinance 78–1 is to render it all but impossible in Galveston for a proprietor to open a theater to exhibit adult films or for patrons to attend them. The district court erred in failing to consider the consequences of confining adult theaters to "the most unattractive, inaccessible, and inconvenient areas of a city." *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d at 336 (holding that the restriction of abortion facilities to undesirable areas places a significant burden on a woman's decision whether to have an abortion). Viewing Ordinance 78–1 in light of its impact on free speech, it is clear that the ordinance drastically impairs the availability in Galveston of films protected for adult viewing by the First Amendment. Galveston's ordinance thus cannot be sustained as a reasonable time, place, and manner regulation under *American Mini Theatres, supra*. Instead, we must test the ordinance under the more stringent standard of *Schad v. Borough of Mt. Ephraim, supra* in

---

**10.** Justice Powell separately concurred in the judgment in *American Mini Theatres*, thus furnishing the vote necessary for a majority of the Court. Nevertheless, Justice Powell expressly concurred in the portion of the plurality opinion noting that *American Mini Theatres* did not involve a significant restraint of speech or of viewer access to speech. *See* 427 U.S. at 73, 96 S.Ct. at 2453–54 (Powell, J., concurring in part to II of the Court's opinion); *id.* at 78–79, 96

S.Ct. at 2456–57 (the ordinance does not involve "any significant overall curtailment of adult movie presentations, or the opportunity for the message to reach an audience.")

**11.** One theater, the Broadway Theatre, continues to show X-rated films (those to which minors may not be admitted under the motion picture industry's own rules) under a grandfather clause in the ordinance.

which the zoning ordinance prohibited live entertainment in the city.

█ *Schad* directs us to examine the strength and legitimacy of the governmental interest behind the ordinance and the precision with which the ordinance is drawn. Unless the ordinance advances significant governmental interests and accomplishes such advancement without undue restraint of speech, the ordinance is invalid. 101 S.Ct. at 2183–84. We conclude that Ordinance 78–1 is neither motivated by a sufficient governmental interest, nor narrowly tailored so as to satisfy the First Amendment.

As to the showing of governmental interest, the avowed reason for Ordinance 78–1 is to arrest deterioration of the downtown area and to prevent and curtail crime. The mayor of Galveston testified that he saw a link between the deterioration of the downtown area and the opening up of an adult theater. In the mayor's eyes, the efforts of Galveston to restore the troubled downtown area would be thwarted by the entry of an adult theater into the heart of the zone targeted for renovation. Ordinance 78–1 purported to respond to the concern for the adverse effects of adult theaters by dispersing those theaters throughout the city.

█ The rehabilitation of blighted urban areas and the use of zoning to accomplish urban renewal are legitimate goals for a city. An adult theater ordinance that furthers such goals satisfies the initial requirement that the city have a substantial state interest to support a law restricting free speech.[12]

█ The assertion of a state interest, however, is not enough. *Schad v. Borough of Mt. Ephraim*, 101 S.Ct. at 2184. The city must buttress its assertion with evidence that the state interest has a basis in fact and that the factual basis was considered by the city in passing the ordinance. *Id.* at 2185 (rejecting, for want of a factual basis,

asserted reasons given in support of an ordinance that restricted First Amendment rights); *Avalon Cinema Corp. v. Thompson*, 667 F.2d 659, 661 (8th Cir. 1981) (en banc) (relying on the city's failure to prove deleterious effects of adult theaters in striking down an adult theater ordinance); *Keego Harbor Co. v. City of Keego Harbor*, 657 F.2d 94, 98 (6th Cir. 1981) (requiring the city to prove its justification for burdening First Amendment rights of adult theater operators).

Still limiting our inquiry at the moment to governmental interest, there is no evidence in the record that the Galveston City Council passed Ordinance 78–1 after careful consideration or study of the effects of adult theaters on urban life. The purported nexus between crime and adult theaters appears to be premised solely upon the speculation of Galveston city officials. Even at trial, Galveston offered no evidence of what vices would flourish if adult theaters were allowed downtown.

This paucity of evidence stands in sharp contrast to the facts of *American Mini Theatres*. In that case, the Detroit Common Council had heard extensive testimony before it enacted an adult theater ordinance. The Detroit Council considered the studies of sociologists and urban planners on the consequences of allowing concentrations of adult theaters. Only after its consideration did Detroit decide to disperse them. *American Mini Theatres*, 427 U.S. at 80 n.4, 96 S.Ct. at 2457 n.4 (Powell, J. concurring). The Council's findings were crucial to the Supreme Court in upholding the Detroit ordinance. *See id.* at 55, 80, 96 S.Ct. at 2445, 2457. Here, the empty record before the Galveston City Council when it decided to regulate adult theaters undermines its contention that the ordinance in fact furthers the goal of rehabilitating the downtown area. No evidence was introduced to supplement or bolster the City Council's

12. See *American Mini Theatres*, 427 U.S. at 71 & n.34, 96 S.Ct. at 2452–53 & n.34 (plurality opinion noting that Detroit's adult theater ordinance aimed at "the secondary effects"—nurturing crime and promoting blight—of concen-

trations of adult theater, and that such a goal must be accorded "high respect"); *id.* at 80, 96 S.Ct. at 2457 (Powell, J., concurring and noting that Detroit's ordinance served "important and substantial" interests).

assumption that one adult theater located downtown and urban blight are linked.

The timing of the ordinance's passage also casts doubt on the relationship between the ordinance and its alleged purpose. *See Avalon Cinema Corp.*, 667 F.2d at 661. Galveston had no zoning restrictions on adult theaters until Basiardanes announced the opening of a theater across the street from the Grand Opera House. The Grand Opera House is a major and expensive project in Galveston's redevelopment plan. The sequence of events strongly suggests that Galveston reacted to Basiardanes' proposed theater because of its location, not because of the City's concern with urban deterioration.

The protection of the Grand Opera House's attractiveness to patrons is a legitimate goal.[13] But it is not one with the same weight as the preservation of inner cities against crime and blight, nor is it one that entitles the City to squelch free speech. The history of Ordinance 78–1 leads us to conclude that the City's motive was to remove Basiardanes' adult theater from the vicinity of the opera house because of apprehension that an adult theater would drive patrons away. This history does not support Galveston's claim that it was motivated by the crime and blight problem.[14]

Finally, the narrow focus of the ordinance on adult theaters and bookstores alone renders suspect the City's claim that the ordinance aimed to cure the deterioration of the downtown. As far as the record shows, Galveston places no zoning restrictions on bars, pool halls, pawn shops, or massage parlors. Rather, Galveston has trained its sights solely on theaters exhibiting films that enjoy First Amendment protection. *Cf. American Mini Theatres*, 427 U.S. at 53–54, 96 S.Ct. at 2444–45 (Detroit

ordinance regulated nine uses viewed as causes of blight in addition to adult theaters). Galveston need not tackle all of its zoning problems at once, see *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). The City's exclusive attention to adult theaters, however, cuts against the argument that Ordinance 78–1 is motivated to protect the urban environment against decay.

■ In sum, we conclude that Galveston has not sustained its burden of showing that Ordinance 78–1 responds to the adverse effects of adult theaters rather than to a perceived unpleasantness in having an adult theater downtown.

■ Even assuming our conclusion was otherwise on the showing of governmental interest, we would still be unable to sustain the constitutionality of Ordinance 78–1. To survive judicial scrutiny, the City must also show the ordinance is narrowly drawn to serve a legitimate government interest with only the minimum intrusion upon First Amendment freedoms. *Schad*, 101 S.Ct. at 2186; *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980). Ordinance 78–1 restricts speech much more broadly than is necessary to achieve its asserted purposes.

Ordinance 78–1 does far more than to regulate obscene movies, or sexually-explicit movies that are sheltered by the First Amendment although bordering on the obscene. Galveston defines the coverage of its ordinance by reference to Texas law on what adults believe is undesirable viewing for minors without parental consent. The ordinance thus reaches many films that are far removed from what is colloquially

---

**13.** We do not, of course, pass upon the obvious hypothetical undertaking to protect the opera house through condemnation of nearby areas under the power of eminent domain or by a narrowly drawn zoning ordinance protecting the immediate vicinity of the opera house from various undesirable businesses.

**14.** Again, the ordinance in *American Mini Theatres* stands on a different footing. Detroit had

dispersed regulated uses not including adult theaters for ten years in its Anti-Skid Row Ordinance before deciding to add adult theaters to the list of regulated businesses. 427 U.S. at 53–54, 96 S.Ct. at 2444–45. Detroit officials had thus made clear their concern with urban blight long before deciding to halt the adverse effects attributed to concentrations of adult theaters.

termed "hard core," or even "soft core," pornography.

■ Basiardanes himself proposed to exhibit only "adult movies," lawful but of the more explicit variety. Nevertheless, under the First Amendment overbreadth doctrine, he is entitled to argue that the ordinance is unconstitutional as applied to other theater operators whose fare, though sexually graphic and subject to the ordinance, falls in the mainstream of American film entertainment. *Schad*, 101 S.Ct. at 2181 (exhibitor of nude dancing may raise the First Amendment claims of theaters and concert halls to attack an ordinance prohibiting all live entertainment). The overbreadth of Ordinance 78–1 is real and substantial in relation to its legitimate scope, if any. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

Many works that might be classified as obscene for minors, and therefore regulated by Ordinance 78–1, are works of merit to adults. The Supreme Court has condemned a state law under which a defendant was prosecuted for selling to an adult a book that was obscene to children. *Butler v. Michigan*, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957). The Court reasoned that such a law would "reduce the adult population ... to reading only what is fit for children." *Id.* at 383, 77 S.Ct. at 526. Galveston's ordinance has a similar effect on adults who view films.

■ American theaters today commonly exhibit a broad range of films that may be unfit for children without in any way contributing to urban blight or promoting crime.[15] Yet theaters showing these movies are subject to Ordinance 78–1 to the same extent as an adult theater showing films on the fringe of the obscene. Whatever connection there is between crime or blight and adult theaters, the requisite connection is surely missing with respect to popular but sexually oriented films, which are covered by Ordinance 78–1.[16] The scope of Ordinance 78–1 exceeds any legitimate governmental purpose in upgrading the downtown and preventing crime. Because Ordinance 78–1 is far more restrictive than necessary to achieve its purported goals, it violates the First Amendment.

It must be made totally clear that this ordinance, through the guise of regulation, banned theaters showing motion pictures that admittedly could be shown with complete legality to every person in Galveston seventeen years of age and over. The intrusion upon First Amendment rights is manifest.

### IV. Permit Requirement

Ordinance 78–1 authorizes the establishment of an adult theater in a qualified location only after the City Council grants a permit specifically sanctioning such a use. Section 52(b), quoted at 514 F.Supp. at 985. Basiardanes challenges the permit scheme as vesting undue discretion in public officials in violation of the First Amendment. *See, e.g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The district court held that Basiardanes lacked standing to raise this claim because the permit scheme had no effect on him.

■ At oral argument, Basiardanes conceded that he lacks standing to attack the permit system, and this concession was

---

15. Basiardanes has pointed to "Last Tango in Paris," which received an X-rating from the Motion Picture Association of America, and "Midnight Cowboy," which received an R-rating, as films that deal explicitly with sex in a fashion that may lead a state to shield them from minors, but whose very popularity negates any notion that they pose a threat to the health of a city. The ordinance at issue here does not refer to the film industry standards, and we do not rely on them in concluding that Ordinance 78–1 is unduly restrictive.

16. The mayor of Galveston acknowledged that R-rated films, to which youths may be admitted only when accompanied by a parent or guardian, *Erznoznik v. City of Jacksonville*, 422 U.S. at 206 n.1, 95 S.Ct. at 2271 n.1, are not considered by the City Council to cause urban blight. While the R-rating has no relation to the standard of Ordinance 78–1, many films rated R could be subject to 78–1.

correct. We are concerned in this suit with retrospective, not prospective, relief. Basiardanes does not seek injunctive relief in his capacity as a building owner, and we have held above that he does not have standing to seek injunctive relief in his capacity as a film viewer. This remains a suit only for money damages. The alleged damages were caused by Ordinance 78–1's denial to Basiardanes of his freedom to lease his building for use as an adult theater. Basiardanes has standing, therefore, to challenge the ordinance only insofar as he suffered damages from the ordinance's effect on his use of the building or otherwise suffered a restraint of his First Amendment rights.

 The ordinance precluded Basiardanes from obtaining lease revenues from Universal Amusements Company because of the dispersal provisions alone. The permit system played no role in causing the injuries Basiardanes has alleged. Basiardanes did not actually apply for a permit, nor did the threat of unchanneled discretion in Galveston city officials deter him from engaging in activity protected by the First Amendment.[17] There is, therefore, no basis in this damages action for undertaking to adjudicate the constitutionality of Galveston's permit system.

## V. Advertising Ban

Basiardanes' final challenge is to the advertising ban in Ordinance 78–1. The ordinance provides that "[a]dvertisements, displays, or other promotional materials for an adult bookstore or adult picture theater

shall not be shown or exhibited so as to be visible to the public from any street, sidewalk, or other public place." Ordinance 78–1, Section 52(a)(iii), quoted at 514 F.Supp. at 984. Basiardanes contends that this absolute drawing of the curtains on adult theaters' advertising excessively regulates commercial speech in violation of the First Amendment.

 The district court denied Basiardanes standing to challenge the advertising restriction. The court apparently believed that Basiardanes had standing to challenge provisions of the ordinance only if they affected his property. In the court's view, the advertising ban had not "operated against [Basiardanes'] property interest." [18] 514 F.Supp. at 979. We hold that the advertising ban had an actual and specific impact on Basiardanes' First Amendment rights, giving him standing to challenge the ban.

After entering into the lease with Universal Amusements Company, Basiardanes posted a sign advising the public of his plans to bring adult entertainment to downtown Galveston. Galveston quickly imposed a moratorium on downtown building permits and also pressured Basiardanes to remove his sign. The sign had borne nothing more than the legend "Adult Theater." At trial, Basiardanes testified that he would have reposted the sign, in anticipation of winning this lawsuit, but for the advertising ban in Ordinance 78–1.

 The advertising ban restrained Basiardanes from placing the sign on his building.[19] Allegations of infringements of

---

17. It is, of course, well settled that a litigant who is up to the point of needing a permit has standing to challenge the permit scheme even without applying for a permit. *Freedman v. Maryland*, 380 U.S. at 56, 85 S.Ct. at 737–38; *Beckerman v. City of Tupelo*, 664 F.2d 502, 625 (5th Cir. 1981). Not every anticipatory challenge to a permit scheme, however, is justiciable. For example, in *Fernandes v. Limmer*, 663 F.2d 619 (5th Cir. 1981), we held that the plaintiff had standing to challenge a scheme for granting permits even though she had not applied for one, but denied her standing to challenge the scheme for revoking permits. We reasoned that the threat posed by the revoca-

tion scheme was too contingent to confer standing upon a litigant who had not yet obtained a permit. 663 F.2d at 626.

18. The court commented in a footnote, however, that it viewed the advertising ban as "patently unconstitutional." 514 F.Supp. at 979 n.8.

19. Basiardanes need not have flouted Ordinance 78–1 in order to have standing to challenge it. Laws restraining First Amendment rights may be challenged by those who allege a desire to engage in the proscribed or regulated activities although they have not yet done so.

free speech, of course, may be redressed under the civil rights laws. *Douglas v. City of Jeannette*, 319 U.S. 157, 162, 63 S.Ct. 877, 880, 87 L.Ed. 1324 (1943). Accordingly, we turn to the merits of Basiardanes' claim.

 Commercial speech, once excluded from the coverage of the First Amendment, now enjoys constitutional protection. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, supra.* *See In Re R.M.J.,* —— U.S. ——, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); *Central Hudson Gas Co. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *United States Postal Service v. Athena Products, Ltd.,* 654 F.2d 362 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982). State and local governments have freer rein to regulate commercial speech than political or expressive speech, however. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (upholding the prohibition of commercial speech on billboards but striking down the prohibition of noncommercial speech on billboards). Recent Supreme Court cases teach that to regulate truthful commercial speech, the government must have a substantial interest that the regulation directly advances. In addition, the regulation must be no "more extensive than is necessary to serve that interest." *Cen-*

*tral Hudson Gas v. Public Service Commission,* 447 U.S. at 566, 100 S.Ct. at 2351. *See also In Re R.M.J.,* 102 S.Ct. at 2892 (plurality opinion). Applying this analysis to Galveston's restraint on adult theater advertising, we conclude that the restraint is constitutionally infirm.

 Galveston offered no justification in its brief for its advertising ban and the ordinance itself gives no clue of its purpose. Trial testimony suggests however, that Galveston was attempting to shield the public from lurid advertisements for sexually explicit films. The interest in so doing is both strong and legitimate. Provocative posters depicting the celluloid delights within an adult theater may be kept from the eyes of minors, at the least. *New York v. Ferber; supra, FCC v. Pacifica Foundation, supra.* Moreover, a ban directly serves that governmental interest. The prevention of advertising keeps sexually explicit posters off the streets. But the regulation in this case fails to serve this interest narrowly.[20] The ordinance, as written, prohibits even a simple sign announcing the existence of an adult theater. The sign posted by Basiardanes did no more. Such a restraint goes far beyond the City's legitimate interest. The absolute proscription of adult theater street advertising cannot be sustained.[21]

 Our conclusion that the advertising ban is unconstitutional does not imply

*Beckerman v. City of Tupelo,* 664 F.2d 502, 506 (5th Cir. 1981). For example, in *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), plaintiffs alleged that they wished to campaign door-to-door, but made no allegation that they had actually begun to campaign in this manner. Nevertheless, the Supreme Court allowed them to challenge an ordinance requiring a permit before one could canvass door-to-door.

20. The Mayor of Galveston acknowledged as much at trial;

Question: And isn't it true that this portion of the ordinance isn't directed at, say garish signs; it is directed at all signs that have nothing to do with urban blight, nothing to do with signs that are distasteful to the public?

Answer: I would say so.

Question: This paragraph really goes far beyond the intentions of City Council; isn't that true?

Answer: I would guess it does.

21. If Galveston adopted its ban on advertising as a means to prevent people from attending adult films, the ban is flatly invalid. A city cannot restrict truthful commercial speech because the city "is fearful of that information's effect on its disseminator and its recipients." *Metromedia, Inc. v. City of San Diego,* 101 S.Ct. at 2191 (plurality opinion); *Linmark Associates v. Willingboro,* 431 U.S. at 96, 97 S.Ct. at 1620 (striking down a ban on "for sale" signs on property, which ban was designed to stem racial blockbusting). Galveston must aim at legitimate and substantial purposes when restricting commercial speech.

that Basiardanes can recover substantial damages for the violation of his rights. Damages may be recovered only upon a showing of actual injury. For a violation of the First Amendment unaccompanied by any real injury, a plaintiff may recover only nominal damages. *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980). *Accord: Kincaid v. Rusk*, 670 F.2d 737, 746 (7th Cir. 1982); *Murray v. Board of Trustees*, 659 F.2d 77, 79 (6th Cir. 1981). *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Our review of the record fails to disclose that Basiardanes has shown any actual injury as a result of the advertising ban. We therefore hold that he is entitled only to nominal damages for the unconstitutional restraint of his commercial speech rights.[22] We note, however, that an attorneys' fees award may be supported by an award of nominal damages since the successful claim serves to vindicate constitutional rights. *Carey v. Piphus*, 435 U.S. at 257 n.11, 98 S.Ct. at 1049 n.11; *Milwe v. Cavuoto*, 653 F.2d 80, 82 (2d Cir. 1981).

## CONCLUSION

Cities have authority to use zoning to protect the living quality of their commercial and residential areas. The power to zone, however, may not overwhelm the guarantees of the Bill of Rights. A distaste for adult theaters, no matter how responsive it is to community values, is not a strong enough state interest to justify a massive incursion into the First Amendment rights of viewers and exhibitors of non-obscene completely lawful adult films. We conclude that Galveston has regulated protected speech without showing a sufficient interest to warrant the magnitude of the restraint accomplished.

To summarize, we hold, first, that Ordinance 78–1 unconstitutionally restricts the opening of adult theaters in Galveston, Texas. To the extent that Basiardanes was denied lease revenues because of the ordinance, he suffered compensable damages.

Second, the ordinance's total prohibition of adult-theater advertising visible from the street impermissibly restrains commercial speech. For this constitutional violation, Basiardanes is entitled to nominal damages. Third, Basiardanes lacks standing to challenge Ordinance 78–1 for vagueness, and also lacks standing to challenge the permit scheme of the ordinance. The judgment of the district court is affirmed in part and reversed in part, and the case remanded.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

22. Basiardanes' claim that Ordinance 78–1 cost him lease revenues stands on different footing, however. We express no opinion here on the extent of those damages other than to indicate that elements of actual damages are revealed by the record.