USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1688

 D.H.L. ASSOCIATES, INC.,

 Plaintiff, Appellant,

 v.

 JOHN O'GORMAN, ROBERT WALLACE, 
 WARREN ALLGROVE, JR, AND EILEEN FARRELL,
INDIVIDUALLY AND IN THEIR CAPACITY AS THE TYNGSBOROUGH BOARD OF
 SELECTMEN, AND AS THE LICENSING BOARD FOR THE TOWN OF
 TYNGSBOROUGH, AND THE TOWN OF TYNGSBOROUGH,
 
 Defendants, Appellees.
 
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Robert E. Keeton, U.S. District Judge]
 
 
 
 Before
 
 Selya, Circuit Judge,
 Coffin, Senior Circuit Judge,
 and Lipez, Circuit Judge.
 
 
 
 
 Thomas Lesser with whom William C. Newman was on brief for
appellant.
 Richard Bowen with whom Jonathan M. Silverstein and
Christopher J. Pollart were on brief for appellees.

December 17, 1999

 
 

 COFFIN, Senior Circuit Judge. Plaintiff-appellant D.H.L.
Associates, Inc., has sought annually since 1994 to persuade
defendants-appellees, the town of Tyngsborough, Massachusetts, and
its board of selectmen to license it to provide nude dancing at its
restaurant, "Matthew's." D.H.L. has never been successful in this
endeavor because Matthew's is not located within the area of
Tyngsborough zoned to allow adult entertainment. In this case,
D.H.L. challenges the constitutionality of Tyngsborough's zoning
ordinance, alleging that even as revised since 1994, it does not
meet the standards set forth in City of Renton v. Playtime
Theatres, Inc., 475 U.S. 41 (1986), and thus violates D.H.L.'s
constitutionally protected freedom of speech. The district court
held the ordinance to be constitutional, and from that judgment
D.H.L. appeals. Finding no constitutional infirmity in
Tyngsborough's zoning ordinance, we affirm.
 I. Factual Background
 Tyngsborough, a rural town of approximately 9500 inhabitants,
is located about 40 miles from Boston near the Massachusetts/New
Hampshire border. The Tyngsborough board of selectmen acts as the
town's executive branch and is authorized to act as the licensing
authority for alcoholic beverage and entertainment licenses. Town
residents voting at meetings constitute the legislative branch of
the town's government and as such are responsible for enacting the
zoning ordinances at issue here.
 The Town has altered its zoning ordinance multiple times in
the past decade. In 1987, the Town, by a vote of the majority of
residents at a town meeting, established the "B-4 zone," in which
adult entertainment, as well as other commercial uses, was
authorized. The B-4 zone, although existing in theory, did not
actually contain any parcels of land and was, in fact, a "phantom
zone." In 1992, D.H.L. applied for and was issued both an all-
alcoholic beverage license and a live entertainment license for its
restaurant called "Bogie's," later called "Matthew's," located in
a general commercial use zone.
 In January 1994, D.H.L. advertised that it would present nude
dancing beginning in February. The following month, an open town
meeting was held in Tyngsborough to discuss adult entertainment and
on February 24, the Town notified D.H.L. that adult entertainment
was not encompassed within its entertainment license. On March 7,
D.H.L. applied to amend its entertainment license to include adult
entertainment, under protest based on its belief that its
entertainment license inherently authorized adult entertainment. 
On March 28, the board of selectmen held a hearing to consider
D.H.L.'s request, but delayed a decision. The next evening, as a
result of a petition signed by more than 650 registered voters, a
special town meeting was held to consider adopting an ordinance
that would prohibit establishments holding liquor licenses from
offering any form of nude entertainment.
 Although the Town did not adopt such an ordinance, town
residents at the meeting unanimously adopted an amended version of
the zoning ordinance to establish a B-4 zone of two lots of land. 
The selectmen subsequently denied D.H.L.'s application to amend its
entertainment license to include live nude dancing on the basis
that the restaurant was not located within the B-4 zone. Each year
since then, the Town has reissued D.H.L.'s entertainment license
but refused to extend it to include nude dancing. Aside from a
two-day license suspension in March 1994, the Town has never
attempted to enforce the limitations of D.H.L.'s license or
otherwise sanction it for its violation of zoning and licensing
regulations, despite the fact that D.H.L. has continued to offer
nude dancing on a daily basis. The Town has, however, represented
to D.H.L. and to this court that it is delaying enforcement only
until this litigation concludes.
 In 1994, D.H.L. filed a claim against the Town and its board
of selectmen in state court, alleging, inter alia, that its state
and federal constitutional rights had been violated and seeking
declaratory and injunctive relief as well as damages. Defendants
successfully sought removal of the case to federal court. 
 Prior to trial, at a town meeting in May 1996, the Town
established an entirely different B-4 zone comprised of 10.4 acres
and consisting of 5 of the 24 lots in Applewood Commercial Park
subdivision. It was the constitutionality of this zone that the
district court upheld following a bench trial in April 1998. The
district court ruled in favor of Tyngsborough on D.H.L.'s federal
constitutional claims, on the grounds that the constitutionality of
the 1987 and 1994 zones were moot issues and the 1996 zone was
constitutional, and remanded D.H.L.'s remaining state claims to
state court for adjudication. D.H.L. appeals, arguing that the
issue of whether its rights were violated under the prior
ordinances was not moot and that even if the 1996 ordinance were
the appropriate benchmark for consideration, it was not
constitutional.
 II. Preliminary Issues
 A. Ripeness
 Initially, we were concerned that D.H.L.'s claims were not
ripe for review because D.H.L. has continued to provide adult
entertainment despite its lack of a license without sanction. We
have resolved this concern, however, because the Town has
represented to the court, consistent with a selectman's testimony
at trial, that it is delaying enforcement of the ordinance against
D.H.L. only until this litigation concludes. Our jurisdiction as
a federal court extends only to "cases" and "controversies," as
authorized by Article III, Section 2, of the United States
Constitution. This means that issues before us must reflect a live
dispute between adverse parties.
 The Supreme Court has explained that the determination of
ripeness depends on "the fitness of the issues for judicial
decision" and "the hardship to the parties of withholding court
consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).
 In situations similar to the present one, prospective
enforcement of an ordinance has been found sufficient to generate
a live case. See, e.g., Sable Communications of California, Inc.
v. Pacific Tel. & Tel. Co., 890 F.2d 184, 187 (9th Cir. 1989) ("A
threat that emanates from a regulation, compulsory in nature, to
which the plaintiff is currently subject, is real and immediate if
the possibility of enforcement is more than hypothetical."). When
a constitutional claim is at issue, a plaintiff need not "await the
consummation of the threatened injury to obtain preventive relief." 
Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923). 
 In this case, it is clear that D.H.L. is subject to a real and
immediate threat of enforcement of Tyngsborough's zoning ordinance
and therefore its claims are ripe for our consideration. See
Pustell v. Lynn Pub. Schs., 18 F.3d 50, 52 (1st Cir. 1994);
Neiderhiser v. Borough of Berwick, 840 F.2d 213, 218 (3d Cir.
1988).
 B. Mootness
 Next, we address D.H.L.'s argument that the district court
erred by holding that the constitutionality of the 1987 and 1994
zones were moot issues. D.H.L. contends that these issues are, in
fact, dispositive of the case. We review the court's determination
of mootness de novo. See Verhoeven v. Brunswick Sch. Comm., 1999
WL 721698, *4 (lst Cir., Sept. 21, 1999).
 "Simply stated, a case is moot when the issues presented are
no longer 'live' or the parties lack a legally cognizable interest
in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). 
The Supreme Court has described mootness as "'the doctrine of
standing set in a time frame: The requisite personal interest that
must exist at the commencement of the litigation (standing) must
continue through its existence (mootness).'" United States Parole
Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (quoting Henry P.
Monaghan, "Constitutional Adjudication: The Who and When," 82 Yale
L.J. 1353, 1384 (1973)). 
 We conclude that the validity of the 1987 and 1994 ordinances
are moot issues because even if we were to find the provisions
unconstitutional, D.H.L. would not be entitled to any relief. 
First, D.H.L. cannot allege damages from the application of the
1987 or the 1994 ordinance because neither was ever enforced
against D.H.L. Although D.H.L. was denied a permit under the
authority of the 1994 ordinance, it continued to engage in the
prohibited conduct on a daily basis without repercussion. Although
a claim for damages from a no longer effective ordinance might in
other circumstances save the issue of the ordinance's lawfulness
from a determination of mootness, D.H.L. can make no such claim
here. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 478
n.1 (1989) (plaintiff's claims not moot even though challenged
ordinance repealed because town refused to grant contracts to
plaintiff while ordinance was in effect).
 Second, we are without power to grant injunctive and
declaratory relief because the 1987 and 1994 ordinances no longer
exist. In Diffenderfer v. Central Baptist Church, Inc., 404 U.S.
412 (1972), the Supreme Court emphasized that it had to "review the
judgment of the district court in light of [state] law as it now
stands, not as it stood when the judgment below was entered." See
id. at 414-15 (holding that when the only relief sought was a
declaratory judgment that a statute was unconstitutional, but the
statute was repealed pending appeal, the case was moot). The Court
has also stated that when a challenged federal statute is amended
after review by courts of appeals, the issues presented to the
Supreme Court on appeal are rendered moot. See United States Dep't
of Justice v. Provenzano, 469 U.S. 14, 15 (1984); see also Burke v.
Barnes, 479 U.S. 361, 363 (1987) (finding that case was moot when
bill at issue expired after the court of appeals entered judgment
and stating that "it is not enough that there may have been a live
case or controversy when the case was decided by the court whose
judgment we are reviewing"); United States Dep't of the Treasury v.
Galioto, 477 U.S. 556, 559-60 (1986) (concluding that when statute
was altered such that issues decided by court below were moot, the
Court must set aside the lower court's decision).
 D.H.L. attempts to bypass this precedent through reliance on
an exception to the mootness doctrine for situations in which the
defendant voluntarily ceases the challenged practice. See City of
Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)
(holding that when an ordinance's revision became effective while
the case was pending in the court of appeals, the Court retained
jurisdiction over the question of the constitutionality of the
prior ordinance). This exception applies, however, only when there
is a reasonable expectation that the challenged conduct will be
repeated following dismissal of the case. See id. at 289 & n.11
(city had announced an intention to return to its original conduct
after the litigation was concluded); Northeastern Florida Chapter
of the Associated General Contractors v. Jacksonville, 508 U.S.
656, 662 & n.3 (1993) (challenged statute had not been sufficiently
altered to allow a conclusion that the conduct would not be
repeated). In this case, the ordinance has been recast apparently
for the purpose of making it more likely to overcome constitutional
challenge and it has remained unchanged since 1996. With no
indication of a contrary intent, it would be unreasonable to
presume that the Town would return to its prior zoning plans after
the conclusion of this litigation. Thus, the voluntary-cessation
exception to the mootness doctrine is inapplicable here.
 D.H.L. makes an additional argument that the issue is not
moot, relying on a stipulation between the parties that if D.H.L.
had been issued an adult entertainment license in 1994, the license
would have been renewed automatically in subsequent years
regardless of alterations to the zoning code. The critical flaw in
D.H.L.'s analysis is that even if we were to hold that the 1994
zone had been unconstitutional, such a ruling does not necessarily
lead to the conclusion that D.H.L. would have been granted a
license in 1994. As D.H.L. appeared to acknowledge to the trial
court, the Town would have retained the ability, after a finding of
unconstitutionality, to review D.H.L.'s request and deny it for
another, legitimate reason. An alternative scenario is that the
Town might have created a constitutional adult entertainment zone
before reviewing D.H.L.'s application for a license and could then
lawfully have refused it the license. 
 It is not for this court to speculate as to what might have
happened had the Town's statute been struck down before it was
superseded by the 1996 zoning ordinance now in effect. Thus, the
stipulation between D.H.L. and the Town, that if D.H.L. had
received a license in 1994 it would have received a license every
year thereafter, does not entitle D.H.L. to a license in the first
instance.
 III. Constitutionality of the 1996 Zoning Ordinance
 We thus turn to the constitutionality of Tyngsborough's 1996
zoning ordinance, currently in effect. In reviewing an appeal from
an adverse ruling after a bench trial, we review the district
court's legal determinations de novo, "according a significant
amount of deference to the court's factual determinations and to
most of its resolutions of mixed fact/law issues." Globe Newspaper
Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 181 (1st Cir.
1996). Tyngsborough's 1996 zoning ordinance defines "adult
entertainment establishments" as including those providing live
entertainment "which consists of entertainers engaging in 'Sexual
Conduct' or 'Nudity.'" See Tyngsborough Zoning By-Laws 2.11.46. 
The ordinance restricts the location of such businesses to the B-4
zone. See id. 2.10.00, 2.11.00. It also authorizes the board of
selectmen or the planning board to grant special use permits for
adult entertainment establishments. See id. 1.16.00.
 Generally, "[t]he power of local governments to zone and
control land use is undoubtedly broad and its proper exercise is an
essential aspect of achieving a satisfactory quality of life in
both urban and rural communities." Schad v. Mount Ephraim, 452
U.S. 61, 68 (1981). Nevertheless, a town's zoning power "must be
exercised within constitutional limits." Moore v. East Cleveland,
431 U.S. 494, 514 (1977) (Stevens, J., concurring). As we have
articulated: "Freedom of speech is among the most precious of our
constitutional rights. Thus, courts have long recognized that,
when governmental action places speech in special jeopardy, special
protections must apply." National Amusements, Inc. v. Town of
Dedham, 43 F.3d 731, 736 (lst Cir. 1995). 
 A. Appropriate Level of Scrutiny
 We begin our analysis by noting that the activity which is
being restricted, nude dancing, is presumably constitutionally
protected speech. The Supreme Court has described nude dancing as
"expressive conduct within the outer parameters of the First
Amendment, though . . . only marginally so." Barnes v. Glen
Theatre, Inc., 501 U.S. 560, 566 (1991) (plurality opinion).
 We next determine what level of scrutiny we should apply to
the restriction on this constitutionally protected activity, which
correlates directly to whether the ordinance is content-based or
content-neutral. An ordinance is not content-neutral if the
government has adopted it "'because of disagreement with the
message it conveys.'" National Amusements, 43 F.3d at 737 (quoting
Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Further, a
"regulation that serves purposes unrelated to the content of
expression is deemed neutral, even if it has an incidental effect
on some speakers or messages but not others." Ward, 491 U.S. at
791; see also Tollis Inc. v. San Bernadino County, 827 F.2d 1329,
1332 (9th Cir. 1987) ("[The content-neutral] requirement is met if
the involved ordinance is 'aimed to control secondary effects
resulting from the protected expression' rather than at inhibiting
the protected expression itself." (quoting International Food &
Beverage Sys. v. City of Fort Lauderdale, 794 F.2d 1520, 1525 (llth
Cir. 1986))). 
 In National Amusements, an ordinance that prohibited the
showing of motion pictures between 1:00 a.m. and 6:00 a.m. was
deemed to be content-neutral because it did not reference the
substance of the speech it regulated and did not appear to have
arisen as a means of suppressing a particular message. See
National Amusements, 43 F.3d at 737-39. The Court in Renton
grappled with an ordinance that prohibited adult motion picture
theaters from being located within 1000 feet of any residential
zone, family dwelling, church, park, or school, and concluded that
the ordinance, although it treated theaters that specialized in
adult films differently from other theaters, was content-neutral
because it was aimed not at the content of the films but rather at
the secondary effects of such theaters on the surrounding
community. See Renton, 475 U.S. at 47-49 (concluding that "at
least with respect to businesses that purvey sexually explicit
materials, zoning ordinances designed to combat the undesirable
secondary effects of such businesses are to be reviewed under the
standard applicable to 'content-neutral' time, place, and manner
restrictions" (footnotes omitted)).
 Thus, it is clear that an ordinance such as Tyngsborough's, if
aimed at combatting the secondary effects of nude dancing rather
than the content of the message expressed by nude dancing, is
content-neutral. In determining whether the Tyngsborough ordinance
is aimed at secondary effects, we note that a town is "entitled to
rely on the experiences" of surrounding cities and towns: "The
First Amendment does not require a city, before enacting such an
ordinance, to conduct new studies or produce evidence independent
of that already generated by other cities, so long as whatever
evidence the city relies upon is reasonably believed to be relevant
to the problem that the city addresses." Id. at 51-52 (holding
that ordinance was validly designed to serve the substantial
government interest of preserving the quality of urban life). 
Moreover, the Supreme Court has noted that a municipality's
interest in protecting and preserving quality of life "must be
accorded high respect." See Young v. American Mini Theatres, Inc.,
427 U.S. 50, 71 (plurality opinion); see also Barnes, 501 U.S. at
583 (Souter, J., concurring) (stating that the interest of
government in "preventing prostitution, sexual assault, and other
criminal activity" is "plainly a substantial one").
 D.H.L. challenges Tyngsborough's assurance that the ordinance
was enacted to combat secondary effects and alleges that it did not
rely on any "studies" of secondary effects. The district court,
however, found that the record showed a "reasoned basis for
evaluation of potential secondary effects as sufficiently likely to
occur and to involve significant consequences for community welfare
to justify the challenged zoning ordinance," even though such
evidence did not appear explicitly in town meeting minutes. 
Specifically, the court credited the testimony of John O'Gorman,
chairman of the board of selectmen, regarding his instruction to
the town administrator and the special town counsel, prior to the
enactment of the 1994 zoning ordinance, to gather information about
how other localities addressed adult entertainment and secondary
effects issues. O'Gorman testified:
 I as the chairman of the Board of Selectmen instructed
 the town administrator along with special counsel to
 research all that they could with regard to adult
 entertainment, how it could be controlled, how it could
 be zoned, what other communities were doing, what other
 jurisdictions were doing with regard to adult
 entertainment. . . . [We did this to] learn as much as we
 could about adult entertainment and how it could be
 controlled, how it could be zoned within our community.

O'Gorman also testified that at the time of the 1994 zoning
changes, the Town was aware that the two clubs in town that
allegedly offered adult entertainment generated more police calls
than other clubs. He stated that the public reaction to a
proliferation of unlicensed adult entertainment was "tremendous"
and many residents expressed great concern.
 The district court also noted that a document, prepared for
the 1994 special town meeting, evidenced public discussion prior to
the ordinance's enactment and that testimony substantiated the
Town's claim that it relied on its impression, supported to at
least some extent, that adult entertainment establishments placed
greater demands on police because more calls were generated from
those establishments. See National Amusements, 43 F.3d at 742
(noting that legislatures may rely on evidence of past problems
with a particular activity and need not conduct an investigation to
corroborate each incident). At the special town meeting, an open
forum was held to educate the public on methods of zoning adult
entertainment businesses and to allow citizens to express their
concerns about the secondary effects of these businesses. We
therefore conclude that the district court did not err in finding
that ordinance was designed to combat secondary effects and is
content-neutral. We also note that although secondary effects were
more pointedly considered by the Town when enacting its 1994 zoning
ordinance, the discussions that took place at that time can
certainly be considered to pertain to the justifications of the
1996 modification of the zone.
 B. The Application of the Renton Test
 Because the ordinance does not create an outright ban on adult
entertainment and was enacted to address the secondary effects of
adult entertainment rather than its content, it is a time, place,
and manner restriction. See, e.g., Tollis, 827 F.2d at 1332 ("Like
the ordinance involved in Renton, the ordinance before us is
obviously a time, place, and manner regulation, as it does not ban
adult theaters altogether."). As the Supreme Court explained in
Renton, the intermediate scrutiny test for determining the
constitutionality of a content-neutral time, place, and manner
zoning restriction on adult entertainment is whether the ordinance
is narrowly tailored "to serve a substantial government interest
and allows for reasonable alternative avenues of communication." 
See Renton, 475 U.S. at 50 (citing Clark v. Community for Creative
Non-Violence, 468 U.S. 288, 293 (1984)).
 1. Narrowly Tailored to Serve a Substantial Government 
 Interest

 We have already determined that Tyngsborough considered
secondary effects when it created the B-4 zone. We have also
explained that a municipality's concern about secondary effects is
a substantial government interest. Finally, to determine whether
the ordinance fully satisfies the first prong of the Renton test,
we must determine whether Tyngsborough's ordinance is sufficiently
narrowly tailored to meet its interest.
 A content-neutral time, place, and manner restriction is
narrowly tailored if it "'promotes a substantial government
interest that would be achieved less effectively absent the
regulation.'" Ward, 491 U.S. at 799 (quoting United States v.
Albertini, 472 U.S. 675, 689 (1985)). In Renton, the Court held
that the ordinance was narrowly tailored because it "affect[ed]
only that category of theaters shown to produce the unwanted
secondary effects." Renton, 475 U.S. at 52. In the instant case,
Tyngsborough's ordinance, which applies directly to adult
entertainment providers, does not reach other forms of
entertainment. Further, Tyngsborough's use of a zoning mechanism
to restrict such an activity confines the impact of the restriction
to governance of the location of such activity and does not impact
other aspects of the activity. Thus, the ordinance is sufficiently
narrowly tailored to address the Town's substantial interest in
combatting the secondary effects of adult entertainment.
 2. Reasonable Alternative Avenues of Communication
 Moving to the second prong of the Renton test, we evaluate
whether Tyngsborough's ordinance allows reasonable alternative
methods of communication. The essence of this question is not
"whether a degree of curtailment" of speech exists, but rather
"whether the remaining communicative avenues are adequate." 
National Amusements, 43 F.3d at 745 (holding that the limitations
created by an ordinance were not unconstitutional because the
challenger's evidence "does not call into legitimate question the
adequacy of the alternate route of communication"). D.H.L. alleges
that the Tyngsborough ordinance does not provide it with a
reasonable opportunity to open and operate, relying heavily on the
fact that only .09867% of the land within the town's borders has
been designated as the B-4 zone. D.H.L. contends that even if the
owner of the B-4 lots were willing to sell the land to an adult
entertainment establishment, which D.H.L. contends the owner is not
willing to do, such a small percentage of land does not constitute
a reasonable opportunity. 
 D.H.L. misses the mark, however, in emphasizing this single
factor. As the district court recognized, determining whether
Tyngsborough's ordinance provides a reasonable opportunity for
adult business to open and operate requires an evaluation of
multiple factors. See, e.g., 3570 East Foothill Blvd., Inc. v.
City of Pasadena, 912 F. Supp. 1257, 1265 (C.D. Cal. 1995)
("[C]ourts have looked to a variety of relevant factors, including
the percentage of land theoretically available to adult businesses,
the number of sites potentially available in relation to the
population of the city, the number of sites compared with the
existing number of adult businesses, or the number of businesses
desiring to offer adult entertainment."). Thus, the fact that
Tyngsborough allocated only 10.4 acres of its 10,540 acres to the
B-4 zone is relevant but not dispositive. As the Court of Appeals
for the Fifth Circuit has held, "[t]here is no requirement in
Renton . . . or elsewhere that a specific proportion of a
municipality be open for adult businesses or that a certain number
of sites be available." Lakeland Lounge v. City of Jackson,
Mississippi, 973 F.2d 1255, 1260 (5th Cir. 1992); see also North
Ave. Novelties, Inc. v. City of Chicago, 88 F.3d 441, 445 (7th Cir.
1996) (stating that "acreage, standing alone, is largely
irrelevant").
 Because there is no single dispositive evaluative
consideration, an analysis should encompass a variety of factors,
including the percentage of acreage within the zone compared to the
acreage available to commercial enterprises in general. As the
district court noted, "Tyngsborough is a rural town in which the
total acreage in the only commercial district that could properly
be identified as the principal business district occupies very
little of Tyngsborough's total acreage." 
 The number of sites available to adult entertainment
businesses is also relevant. See International Eateries of
America, Inc. v. Broward County, Florida, 941 F.2d 1157, 1165 (11th
Cir. 1991). Reasonable alternative avenues for communication have
been found to exist when six adult businesses were operating in a
town and more than six sites existed in the zoned area. See
Lakeland Lounge, 973 F.2d at 1260 ("As a matter of arithmetic, . .
. there are more 'reasonable' sites available than businesses with
demands for them . . . .").
 In this case, the district court held that all of the five
lots in the B-4 zone were potentially available, crediting the
testimony of Walter Eriksen, owner of the land within the B-4 zone,
that although he had delayed placing the lots on the market in
hopes that they would increase in value, they were now available to
any purchaser for the right price. Despite D.H.L.'s protestations
that the cost of development would be too high, Renton instructs
that D.H.L.'s protection extends only so far as to put adult
entertainment providers on an equal footing with other purchasers
and does not require that they be able to obtain sites "at bargain
prices." See Renton, 475 U.S. at 54 ("That respondents must fend
for themselves in a real estate market, on an equal footing with
other prospective purchasers and lessees, does not give rise to a
First Amendment violation.").
 Because we agree that all of the lots in the B-4 zone are
potentially available and other relevant factors do not negate the
significance of this availability, we hold that Tyngsborough
ordinance provides the constitutionally mandated "reasonable
opportunity to open and operate." We note that one other
establishment, the "Blue Moon," has lawfully offered adult
entertainment in Tyngsborough since before the enactment of the
1987 zoning ordinance and thus has a right to continue operating
despite the fact that it is not located in the B-4 zone. Although
the Blue Moon operates on a grandfather permit, even if it were to
be required to move into the B-4 zone, which it is not, that would
leave five sites for two businesses. 
 Moreover, each of the five lots, as stipulated by the parties,
is suitable for development and has gas, water, and electrical
lines available. The sites are accessible to the public as they
are located in a commercial park with newly developed roadways. 
Although the parties have not supplied us with data about the
number of businesses that would like to offer adult entertainment,
we have not been shown that any business except D.H.L. has been
denied an adult entertainment permit since the enactment of the
1996 zone. For these reasons, we hold that Tyngsborough's
ordinance provides D.H.L., and other businesses wishing to offer
adult entertainment, with a reasonable alternative avenue for
communicating their constitutionally protected speech.
 IV. Certification
 On a final note, we address very briefly D.H.L.'s argument
that the district court erred by declining to certify state law
questions to state court prior to determining the federal
constitutional issues. Because we are not convinced that state law
provides an independent and sufficient basis for deciding the case,
we conclude that the district court did not err by remanding the
case to state court for determination of D.H.L.'s remaining state
law claims after its adjudication of the federal issues.
 In conclusion, because we hold that the constitutionality of
the 1987 and 1994 Tyngsborough zoning ordinances is moot and the
existing ordinance is constitutional, the judgment of the district
court is affirmed.