United States Court of Appeals,

Fifth Circuit.

No. 92–7291.

LAKELAND LOUNGE OF JACKSON, INC., Plaintiff–Appellee,

v.

CITY OF JACKSON, MISSISSIPPI, Defendant–Appellant.

Oct. 5, 1992.

Appeal from the United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, SMITH and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The City of Jackson, Mississippi ("Jackson") amended its zoning ordinance to restrict adult businesses to areas zoned for light industrial use and, with a use permit, some of the central business district. The Lakeland Lounge of Jackson ("Lakeland"), which is such an establishment, challenged the ordinance, and the district court declared it unconstitutional because the members of the city council had not properly considered the secondary effects of sexually oriented businesses, so the ordinance was not content-neutral. Alternatively, the court found that the ordinance did not provide reasonable alternative avenues of communication. Finding no constitutional infirmity in what the city did, we reverse.

I.

In September 1991, a nightclub offering topless dancing opened in Jackson. The city acknowledges that it tried to close the club down for technical code violations, because of great public uproar, but failed. A few weeks later, another club opened.

In September, the mayor had directed the zoning administrator to begin the process for the adoption of some measure to address the public concern. The city attorney's office and the planning department began to assemble materials concerning adult entertainment and to draft a new regulation.

They received examples of other communities' zoning ordinances regulating adult businesses, studies about the effects of such establishments upon their communities, and legal opinions. Several public hearings were held to discuss the matter, including an open meeting of the planning board on January 21, 1992, to which five of the seven members of the city council were invited and five attended. Immediately following that meeting, and also on January 21, the city council met, and the ordinance was presented but held for final adoption a week later.

In January 1992, Lakeland Lounge of Jackson was incorporated, for the purpose of operating a restaurant/lounge with topless dancing. It received beer licenses from the city and state and executed a lease for a property in an area zoned "general commercial."

On January 28, 1992, the city council adopted an amendment to Jackson's zoning ordinance, seeking to disperse adult entertainment establishments. Such establishments were relegated to "light industrial" zoned areas, and also could be located in the central business district if they obtained use permits. Additionally, adult establishments could not be within 250 feet from each other or within 1,000 feet of any residentially zoned property, church, school, park, or playground. The provision also gave pre-existing establishments three years to comply.

Lakeland filed a complaint in February 1992, seeking to have the ordinance declared unconstitutional and its enforcement enjoined. The trial court denied Lakeland's motion for a temporary restraining order. After a bench trial, the court declared the ordinance unconstitutional and permanently enjoined its enforcement. —— F.Supp. ——. Lakeland Lounge opened for business soon afterward.

II.

The Jackson ordinance does not ban adult businesses outright but merely limits the areas of the city in which they may operate. It is thus properly analyzed as a form of time, place, and manner

regulation. *City of Renton v. Playtime Theatres,* 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986) (citing *Young v. American Mini Theatres,* 427 U.S. 50, 63 & n. 18, 96 S.Ct. 2440, 2449 & n. 18, 49 L.Ed.2d 310 (1976)). As such a regulation, it presumptively violates the First Amendment if it was "enacted for the purpose of restraining speech on the basis of its content," and it must be "designed to serve a substantial government interest" and may "not unreasonably limit alternative avenues of communication." *Id.* 475 U.S. at 47, 106 S.Ct. at 928. Cities may not regulate sexually oriented establishments out of mere distaste for the message they communicate—that would be content-based infringement upon expression entitled to at least some protection under the First Amendment. *See, e.g., Barnes v. Glen Theatre,* ——— U.S. ———, ———, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (recognizing that nude dancing is "expressive conduct within the outer perimeter of the First Amendment") (plurality opinion); *see Renton,* 475 U.S. at 46–49, 106 S.Ct. at 928–30 (discussing requirement of content-neutrality). Local governments, however, can restrict adult businesses in order to control the bad "secondary effects"—such as crime, deterioration of their retail trade, and a decrease in property values—that the establishments bring. *See id.* at 46, 106 S.Ct. at 928.

In determining whether the amended ordinance was actually content-neutral, the district court followed the analysis laid out in *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed. 2d 672 (1968). The court stated that it needed to determine the predominant factor motivating the city council in passing the ordinance; it concluded that the city had not shown that that factor was concern over secondary effects.

The court first observed that the ordinance obviously, in its preamble, took note of the secondary effects. Second, it stated that the city had attempted to regulate, rather than prohibit, the adult business. Third, though, the court stated that the city did not show whether the existence of secondary effects had a basis in fact or, more importantly here, "whether that factual basis was considered by the [c]ity in passing the ordinance." The court held that the city council had an

insufficient factual predicate by which to base its ordinance upon secondary effects; therefore, the city had not shown that the ordinance was content-neutral.

The district court based its analysis of the bases for the ordinance upon *Renton,* in which the Court stated that a city may establish its interest in a regulation by relying upon evidence "reasonably believed to be relevant to the problem that the city addresses." 475 U.S. at 51–52, 106 S.Ct. at 931. The *Renton* Court held that in enacting an adult business regulation, a city's justifications were not necessarily "conclusory and speculative" where the municipality based its opinion that such businesses had bad secondary effects upon studies of *other* communities. *Id.* at 50, 106 S.Ct. at 930.

In the instant case, the district court held that the city had to show that it properly adopted the zoning ordinance. It stated that there is no testimony that the members of the city council ever looked at the studies about secondary effects or that they received any summary of those studies from their staff. Although one council member testified that she had received materials about such studies, they came from constituents; she did not testify that she had received copies of the material that the city staffs used or that she had provided her materials to her colleagues.

Noting that it was a close question, the court ruled that the city council should have allowed at least some presentation summarizing the secondary effects, upon which the council purported to rely, and that the council had not produced any evidence that "it relied upon any formal studies to reach the conclusion that there would exist secondary effects if these businesses would be allowed to continue to operate." Concluding that the city had not shown that the amendment was content-neutral, the court held it was unconstitutional.

### III.

We believe that the district court clearly erred and that the record shows that the city council had sufficient information before it to enact a permissible ordinance. First, the office of planning, city

attorney's office, and the ordinance review committee (a subcommittee of the planning board) drafted the ordinance, and they unquestionably considered, and relied upon, the studies as to the secondary effects of sexually oriented business while they were drafting the amendment. Further, the council could properly place some reliance upon others to do research as state law requires that the planning board make recommendations to the council regarding zoning amendments. We perceive no constitutional requirement that the council members personally physically review the studies of secondary effects; such a holding would fly in the face of legislative reality.[1]

Second, although the city council never received a written report or summary of the studies, the city planning board held a public meeting at which the planning director and other city staff members and citizens discussed secondary effects and the work that had gone into the preparation of the proposed ordinance. As testimony and the official minutes of the meeting show, five of the seven members of the city council were present at that meeting; as the ordinance passed by a six-to-one vote, a majority of the council must have both voted for the ordinance and attended the meeting.

Third, the language of the amendment indicates the council's concern with the secondary effects. The preamble states as follows:

> [T]he Planning Board and City Council of the City of Jackson, Mississippi, find that there is substantial evidence, including numerous studies, reports, and findings on the potential harmful effect of adult entertainment uses made by other cities, experts, city planners, etc., which document that such uses adversely affect property values, cause an increase in crime, encourage businesses to move elsewhere, and contribute to neighborhood blight.

It then asserts that it was "necessary, expedient and in the best interest" of the citizenry

---

[1]In light of *Renton's* holding that a municipality may rely upon other cities' studies of secondary effect, 475 U.S. at 50, 106 S.Ct. at 930, and discussion in *Barnes* of the possibility that ordinances may be justified by their secondary effects, without any actual legislative finding, —— U.S. at ——, 111 S.Ct. at 2470 (opinion of Souter, J.), one might argue that legislative findings are no longer be necessary, as the record as to secondary effects has already been made. We need not reach such a conclusion to decide this case, however.

to regulate the operation and location of adult entertainment establishments for the purpose of stemming a potential increase in the criminal activities and disturbances of the peace and good order of the community, maintaining property values, preventing injuries to residential neighborhoods and commercial districts, and protecting and preserving the quality of life through effective land use planning.

This language might not save a statute that was formulated without specific attention to secondary effects. Nevertheless, in context here, where (1) the drafters of the ordinance did rely upon studies of secondary effects, (2) a majority of the councilmembers did receive some information about the secondary effects during an open hearing of the planning board, and (3) nothing in the record otherwise suggests impermissible motives on the part of the councilmembers, the language of the preamble shows the city council's awareness of the studies upon which the planning staff relied when framing the ordinance and reflects that a reasonable legislature with constitutional motives could have enacted the ordinance. *See SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1274 (5th Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).[2]

IV.

Having decided that the city council had not properly considered the ordinance, the district court did not need to determine whether the zoning plan provided sufficient alternative opportunities for the regulated expression. It did so nevertheless, apparently foreseeing possible reversal on the first issue or seeking to guide the city council's future deliberations.

The court stated that any regulation must provide reasonable alternative avenues of communication for the protected expression. *Renton,* 475 U.S. at 54, 106 S.Ct. at 932. Basing its analysis upon *Renton* and *Woodall v. City of El Paso,* 950 F.2d 255 (5th Cir.), *modified,* 959 F.2d

---

[2]"[We] do not ask whether the regulator subjectively believed or was motivated by other concerns, but rather whether an objective lawmaker could have so concluded, supported by an actual basis for the conclusion. Legitimate purpose may be shown by reasonable inferences from specific testimony of individuals, local studies, or the experiences of other cities." (*See also 11126 Baltimore Blvd. v. Prince George's County,* 886 F.2d 1415, 1420 (4th Cir.1989) (intent as set out in legislation's preambles relevant to determination of content neutrality), *cert. granted, judgment vacated, and case remanded on other grounds,* 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990).

1305 (5th Cir.1992), *petition for cert. filed* (July 15, 1992), it asserted that a court must consider whether the regulation leaves available land that is physically, legally, and economically suited for adult entertainment businesses. The court found that most of the land zoned for adult businesses was actually unavailable; it then mentioned that four areas with eight to ten locations were available and suitable. Noting that Lakeland argued that, under *Renton,* large available acreage and a substantial number of sites are required in order reasonably to offer alternative avenues of expression, the court held that those sites did not provide Lakeland with sufficient alternative sites for the carrying on of its business; if other current and future adult entertainment establishments were factored into the calculus, the number of available sites would be reduced proportionately.

We disagree. First, the district court stated that an unspecified number of the proposed locations were inadequate because they were "in remote areas of the city and are not in any area where other retail or commercial development is located. Clearly this type of area would not be reasonable from any macroeconomic analysis standpoint for any type of retail business, which would be the general classification of topless cabarets."

This analysis is based upon an incorrect view of which legal standard to apply. The initial panel opinion in *Woodall* laid out a doctrine of economic impracticality, essentially stating that a site was impractical if no adult business possibly could expect to profit by opening there. 950 F.2d at 261 n. 5. That section of the opinion, which presumably was the source of the district court's "macroeconomic" language, has been withdrawn and thus has no precedential value. With that discussion deleted, *Woodall* merely states that "land cannot be found to be reasonably available if its physical or legal characteristics made it impossible for any adult business to locate there." 950 F.2d at 263.[3] The fact that these locations do not seem particularly desirable for economic reasons does not matter. As the Supreme Court has noted, "The inquiry for First Amendment purposes is not concerned with economic impact." *Renton,* 475 S.Ct. at 54, 106 S.Ct. at 932, (*quoting Young v.*

---

[3]*See also* the modified *Woodall* opinion, 959 F.2d at 1306.

*American Mini Theatres,* 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976) (Powell, J., concurring)). As we have noted, "alternative sites need not be commercially viable." *SDJ,* 837 F.2d at 1276–77 (citing *Renton* ). *See also D.G. Restaurant Corp. v. City of Myrtle Beach,* 953 F.2d 140, 147 (4th Cir.1991) (city not obliged to provide commercially desirable land).

Nothing in the instant record indicates that all or even most of the locations are inaccessible, unsafe, or without utilities or infrastructure or that legal obstacles exist to their use. *See Woodall I,* 950 F.2d at 261–62; *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1214 (5th Cir.1982). Thus, although the record does not permit us to say with precision how many additional sites exist, a substantial number of potential sites do.

Moreover, there is no requirement in *Renton, Woodall,* or elsewhere that a specific proportion of a municipality be open for adult businesses or that a certain number of sites be available. According to the record, two adult entertainment clubs and three adult bookstores were operating in Jackson at the time of the trial; so including Lakeland Lounge, there are six such establishments in the city. As a matter of arithmetic, even without the sites the district court stated were remote, there are more "reasonable" sites available than businesses with demands for them, even if the five previously existing businesses decided to move into the zoned areas (which they need not do for three years under the amortization provisions of the ordinance). Given the limited demand for sites for sexually oriented businesses, this ordinance does not reduce the number of establishments that can open in Jackson, so it does not limit expression.[4] When the "remote" areas of the city are included, it is plain that Lakeland has many alternative locations for its business.

## V.

We thus find that the Jackson City Council properly considered the secondary effects of adult

[4]*See Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 71, 101 S.Ct. 2176, 2183, 68 L.Ed.2d 671 (1981) (ordinance banning nude dancing in *American Mini Theatres* distinguished, because it "did not affect the number of adult movie theaters that could operate in the city)".

business and provided sufficient alternative avenues of expression for them.  The judgment of the district court is REVERSED, and this matter is REMANDED for further proceedings as appropriate.


POLITZ, Chief Judge, dissenting:

I must respectfully dissent because I find that the ordinance of the City of Jackson, Mississippi violates the first amendment.  The ordinance defines its regulatory scope on the basis of "adult" content and is therefore not content-neutral;  it may only be accorded the deferential review given content-neutral regulations if it meets the requirements of a time, place, and manner restriction.[5]  In my view, these requirements are not met.  The Jackson City Council has not demonstrated that its predominant intent was to control negative secondary effects of sexually oriented businesses.  In addition, even assuming the ordinance to be a content-neutral restraint of free speech, it fails because alternative channels of communication of the protected speech at issue here are unavailable.


The ordinance does not qualify for the deferential review accorded content-neutral restraints because it was not "designed to combat the undesirable secondary effects" of the regulated business.[6]

---

[5]*See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986);  *see also SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1273 (5th Cir.1988) ("The *[Renton]* Court submitted the Renton ordinance to the analysis reserved for content-neutral restraints, although the ordinance marked businesses by the content of their product.");  Note, *The Content Distinction in Free Speech Analysis after Renton,* 102 Harv.L.Rev. 1904, 1907–08 (1989) (explaining that *Renton* applies a "content-neutral" standard of review to "content-based time, place, and manner regulations").

The Supreme Court in *Barnes v. Glen Theatre, Inc.,* —— U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), analyzed a public exposure statute pursuant to the four-part test enunciated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).  The *O'Brien* test applies to statutes without content-based references;  it includes an analysis of the extent to which the governmental interest is related to the suppression of free expression.  The *Barnes* decision did not suggest an expansion of *Renton's* looser scrutiny for content-based statutes;  the decision even states that the time, place, and manner test was originally developed for expression taking place in a "public forum" and that *Renton* was "at least one occasion" in which the Court deviated from this application.  —— U.S. ——, 111 S.Ct. at 2460.

[6]*City of Renton,* 475 U.S. at 49, 106 S.Ct. at 929.

Unless the predominant concern of the regulators was to prevent these alleged secondary effects, we should not base our review of the ordinance on the presumption that it is a time, place, and manner restriction unrelated to the suppression of free expression.[7]  To assess the regulators' predominant concern, "we intrude into the regulatory decision process to the extent that we insist upon objective evidence of purpose—a study or findings."[8]  Jackson had the burden of establishing that evidence before the city council entitled the council to reach its conclusion.[9]  The test does not inquire into the council members' subjective beliefs but, rather, searches the legislative history of the ordinance for "an actual basis" upon which an objective regulator could assess the purported secondary effects.[10] Although the City need not conduct its own independent study and is certainly entitled to rely upon empirical data from other municipalities, the regulators must have such studies—and not just the ordinance itself—before them.[11]

Uncontroverted testimony before the district court reveals that the Jackson Planning Board submitted no written materials to the city council.  The ordinance preamble declares that the City of Jackson intended to regulate secondary effects, yet the city council members did not see—much less rely upon—the data which purportedly engendered their alleged "predominant" concerns.  According to the record, four of the seven city council members who voted for the ordinance did attend a public meeting of the Jackson Planning Board, but the minutes of that meeting and the testimony before the trial judge did not reflect that any empirical study data were orally recited or meaningfully discussed.[12]

---

[7]*Id.* at 47, 48, 106 S.Ct. at 928, 929;  *SDJ, Inc.,* 837 F.2d at 1273 (quoting *City of Renton's* reference to the legislatures' "predominant concern").

[8]*SDJ, Inc.,* 837 F.2d at 1274.

[9]*City of Renton,* 475 U.S. 51–52, 106 S.Ct. at 931;  *SDJ, Inc.,* 837 F.2d at 1274.

[10]*SDJ, Inc.,* 837 F.2d at 1274.

[11]*Id.* ("[W]e are persuaded that the *City Council* considered *those studies themselves* and not merely the ordinances for which the studies provided support."  (emphasis added)).

[12]The Minutes of the January 21, 1992 Jackson City Planning Board Public Hearing reflect that Quintus Greene, Director of the Office of Planning, made the following comments:

One city council member, Margaret C. Barrett, did receive some materials regarding secondary effects from her constituents, but she did not circulate this data to her colleagues on the council. Because the council did not examine even an extract of the studies upon which its predominant concerns purportedly rested, I find no basis to justify reviewing this ordinance as a content-neutral regulation. The City used the pretext of technical code violations to attempt to close Jackson's first adult entertainment club. It would appear that the ordinance's preamble is but another such.

The facts of this case stand in stark contrast to those reviewed by the *SDJ, Inc.* court, wherein a specially compiled report of community effects was filed with and adopted by the city council.[13] Similarly, the Renton Court quotes the material before the Renton City Council which described secondary effects of adult entertainment and study results.[14] Indeed, the *Basiardanes v. City of*

---

> Mr. Greene gave a brief summary of the research and intent that have gone into drafting the proposed adult entertainment amendments to the Zoning Ordinance. He mentioned that adult entertainment establishments would be permitted by right in I–1 (Light) Industrial Districts and would be permitted by Use Permit in the C–4 Central Business District. He noted these regulations would prohibit such uses within 1000 feet of any residentially zoned property, church, school, park or playground. Also, no adult entertainment establishment could be located within 250 feet of any other such use. He displayed a map of the City which depicts all of the I–1 Districts and the C–4 District, where such uses could be allowed.

> The district court very accurately described the testimony evidence regarding the hearing:

>> The only testimony that the Court has concerning what went on at the hearing came from the testimony of Quintus Greene of the City Planning and Zoning staff, and Mrs. Barrett, the councilwoman. This testimony showed no consideration of the materials sent by the American Planners Association nor any other type of material that either the City Planning and Zoning people had or that Mrs. Barrett herself had....

>> *There is no testimony whatsoever that the City Council members themselves ever looked at the studies relied upon by its staff, or received any written summary of those studies, or received any oral summary of those studies.*

> (Emphasis added.) The majority would ignore these factual findings which wear the buckler and shield of Fed.R.Civ.P. 52(a).

[13]*See SDJ, Inc.,* 837 F.2d at 1272.

[14]*See City of Renton,* 475 U.S. at 51, 106 S.Ct. at 931.

*Galveston*[15] court objected that "there [was] no evidence in the record that the Galveston City Council passed [the ordinance] after careful consideration or study of the effects of adult theaters on urban life."[16]

In addition, I am not persuaded that the Jackson ordinance passes constitutional muster even as a time, place, and manner restriction. Even a content-neutral ordinance regulating protected speech must be narrowly tailored to serve a substantial governmental interest and must allow for reasonable alternative avenues of communication.[17] The Jackson ordinance bans "[a]dult arcades, adult bookstores, adult cabarets, adult entertainment establishments, adult motels, and adult motion picture theaters" from all areas except those zoned as light industrial. In the light industrial zones such establishments may not be located within 250 feet of each other or 1,000 feet from any residentially zoned property, church, school, park, or playground. By the City's own account to the district court, only 879 acres of Jackson's approximate 70,400 acres are available for adult entertainment uses.[18] This is approximately 1.2 percent of the land mass of the City, as compared with the more than 5 percent which was available in *Renton.*[19] In the district court the City argued that 21 general areas were available; it presented testimony regarding 32 specific sites. By contrast, the *SDJ, Inc.* court, which admittedly analyzed an ordinance in the much larger city of Houston, nonetheless reviewed stronger evidence. One expert responsible for analyzing only 20 percent of the City specified 40 available sites in this portion alone. Other evidence demonstrated that at least 100 and, perhaps, up to tens of thousands of alternative sites existed.[20] Accordingly, accepting Jackson's

---

[15]682 F.2d 1203 (5th Cir.1982).

[16]*Basiardanes,* 682 F.2d at 1215.

[17]*City of Renton,* 475 U.S. at 50, 106 S.Ct. at 930; *SDJ, Inc.,* 837 F.2d at 1273.

[18]The City had originally argued that a ceiling of 1,043 acres were available but retreated from this position when faced with evidence regarding a restrictive covenant on 163 acres.

[19]*City of Renton,* 475 U.S. at 53, 106 S.Ct. at 932.

[20]*SDJ, Inc.,* 837 F.2d at 1277.

argument at full face value, its list of the available sites is less than impressive.

From my review of the record I cannot, however, accept the City's list of sites. I cannot because I cannot justify dismissing the district court's factual findings in this case. The district court found only four available areas containing eight to ten prospective sites. This finding is manifestly not clearly erroneous. Although the court makes one reference to macroeconomics, which was discussed in the vacated portion of *Woodall v. City of El Paso,*[21] the trial court also discounted proposed sites due to physical impossibilities. The district court does not individually apply each reason for unavailability to each site rejected. But the district court's detailed discussion of the available locales nonetheless reveals that it did not place upon the City a duty of providing "sites at bargain prices."[22] For example, the trial court considered warehouses as available because they could be converted to lounges. It also considered a lot next to a slaughterhouse an available adult entertainment site. Referencing the Renton economic rule, the trial court specifically discounted Lakeland's arguments that lack of parking rendered certain business district sites inadequate.

At the very least, I must conclude that this case should be remanded for consideration pursuant to our modifications of *Woodall.* The record clearly shows that physical impossibility, rather than the *Woodall* macroeconomics theory, occasioned a discounting of a majority of the City's proposed 879 acres. The district court described one 300–acre site which lacked physical access as "swampland." Another large site in the northwest sector of the City was described as a floodplain. The testimony of Lakeland's expert also revealed that other alleged sites were adjacent to high voltage power lines or within 1,000 feet of a prohibited use. I therefore must disagree with the majority's conclusion that "nothing in the instant record indicates that all or even most of the locations are inaccessible, unsafe, or without utilities or infrastructure or that legal obstacles exist to their use."

---

[21]950 F.2d 255 (5th Cir.), *modified,* 959 F.2d 1305 (5th Cir.1992).

[22]*City of Renton,* 475 U.S. at 54, 106 S.Ct. at 932.

I respectfully dissent.