**BAS ENTERPRIZE, INC.,
et al., Plaintiff,**

v.

**THE CITY OF MAUMEE,
et al., Defendant.**

**No. 3:02 CV 7583.**

United States District Court,
N.D. Ohio,
Western Division.

Sept. 22, 2003.

John P. Feldmeier, H. Louis Sirkin, Cincinnati, OH, for Plaintiffs/Counter–Defendants.

Sheilah H. McAdams, Marsh McAdams Scharfy Brogan & Schaefer, Maumee, OH, Joan C. Szuberla, Spengler Nathanson, Toledo, OH, for Defendants/Counter–Claimants.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Plaintiffs' motion for summary judgment (Doc. No. 12) and Defendants' cross-motions for summary judgment (Doc. No. 20). Plaintiffs have filed a combined response and reply (Doc. No. 30) and Defendants have filed a reply (Doc. No. 31). Also pending before the Court is Plaintiffs' motion to refund TRO Bond (Doc. No. 13) as to which Defendants have filed a response (Doc. No. 18). Defendants have also filed a motion for attorney's fees (Doc. No. 26) as to which Plaintiffs have filed a response (Doc. No. 29) and Defendants have filed a reply (Doc. No. 32).

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201 & 2202, 42

U.S.C. § 1983 and 28 U.S.C. § 1367. For the reasons stated below, Plaintiffs' motion for summary judgment will be denied. Defendant's cross-motion for summary judgment will be granted. Plaintiffs' motion to refund TRO bond will be granted. Defendants' motion for award of attorney's fees in connection with contempt proceeding will also be granted.

## BACKGROUND

On May 30, 2002, Plaintiff BAS Enterprize, Inc., d/b/a as Halo Ventures, Inc. ("Halo Ventures") entered into a lease agreement with Plaintiff BAJA Investments LLC ("BAJA") for the property located at 1500 Holland Road (the "property") in the City of Maumee, Ohio ("Maumee"). The lease agreement became effective on June 1, 2002. On that same day, Halo Ventures submitted an application for a building permit to Maumee's Division of Building and Zoning within the Department of Public Safety, which included blue prints that included a label "No Change In Use."[1] At that point in time, the property was zoned by Maumee as a C–2 General Commercial District.

On June 3, 2002, the Maumee City Council (the "City Council") unanimously voted to approve as an emergency amendment to its Zoning Code (the "Code"), Ordinance No. 88–2002 (the "Ordinance"), following the recommendation of the Municipal Planning Commission, to which it had previously referred the Ordinance.[2] The Municipal Planning Commission had considered the Ordinance at a public hearing on May 28, 2002. The Ordinance added definitions to Section 1103.01 of Code for sexually oriented businesses, adult entertainment, and adult uses of land.

Moreover, the Ordinance also amended Section 1127.02 of the Code to require that a sexually oriented business locate within the M–2 Industrial District, where such business would be a permitted use. The Ordinance does not completely ban adult establishments, but allows adult cabarets[3] and other sexually oriented businesses featuring nude dancing, and display of specified anatomical areas[4] and specified sexual activities[5] to operate in the M–2 Industrial District. (Doc. No. 12, Mohler Aff., Ex.

1. Previously, the property had been used as a micro-brewery and restaurant.

2. Ohio law provides municipal planning commissions the authority to make zoning recommendations "in the interest of the public health, safety, convenience, comfort, prosperity, or general welfare ..." OHIO REV.CODE § 713.06.

3. The Ordinance defines an Adult Cabaret to be:

 A nightclub, bar restaurant or other similar establishment that regularly features live performances characterized by the exposure of specified anatomical areas or by specified sexual activities, or films, motion pictures, video cassettes, DVD, slides, or other photographic reproductions in which a substantial portion of the total presentation time is devoted to showing of material characterized by the emphasis upon the depiction or description of the specified activi-

ties or specified anatomical areas. (Doc. No.12, Mohler Aff., Ex. 2(B), p. 2).

4. The Ordinance defines specified sexual anatomical areas as to include:

 [L]ess than completely and opaquely covered human genitals, pubic region, buttocks, anus, or female breasts below a point immediately above the areola; or human male genitals in a discernable turgid state, even if completely and opaquely covered. *Id.* at 6.

5. The Ordinance defines specified sexual activities to include:

 i. the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts; ii. sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy; iii. masturbation, actual or simulated; [and] iv. excretory functions as part or in connection

2(B), p. 7). The Ordinance also included several performance standards such as spacial and/or distance requirements and the limitation that no sexually oriented business may locate within one-thousand (1000) feet of a residential zoning district, library, education institution, park, recreational facility, religious place of worship, child day care facility, playground, swimming pool or any planned unit development that includes residential land uses.

On July 18, 2002, Maumee provided Halo Ventures with the requested building permit (the "permit"). Prior to issuing the permit, however, Bruce Wholf ("Wholf"), Maumee's Building and Zoning Inspector, issued two Correction Letters dated June 12 and June 26, 2002 due to deficiencies in the documents Halo Ventures had submitted on May 30, 2002. Pursuant to the permit, Halo Ventures began internal renovations to the property. A substantial amount of correspondence and conversations between Maumee and Halo Ventures then took place as Wholf tried to determine if the intended use of the property was for a sexually oriented business.

Halo Ventures completed renovations to the property and applied for a Certificate of Occupancy on October 17, 2002. The application described the intended use of the property as a "Restaurant, Bar, Nightclub, Live entertainment." (Doc. No. 21, Wholf Aff., Ex. 3(H)). On October 30, 2002, Wholf sent Halo Ventures a letter asserting that the reference to live entertainment on the Certificate of Occupancy application raised a concern that the property would be used for the purposes of a sexually oriented business, which was

prohibited in the C–2 General Commercial District under the Code as amended by the Ordinance. He emphasized that this was not the first time this issue had arisen. Wholf maintained Halo Ventures needed to provide further information regarding the intended use to ensure compliance with the Code.

On October 31, 2002, Halo Ventures responded that the intended use and operation of business as set forth in its application for a Certificate of Occupancy would be consistent with the prior use of the property, and again requested Maumee to make the necessary inspection. Wholf then responded on November 5, 2002, reiterating his ongoing concerns about the nature of the intended use and its conformity withe Code, which he was responsible for enforcing. Halo Ventures sent further correspondence including a letter dated November 11, 2002, which maintained that "the live entertainment to be presented at 1500 Holland Road will be in full compliance with the City of Maumee Zoning Code and will not constitute a 'sexually oriented business' as defined in the City Zoning Code." *Id.* at Ex. 3(M).

Though neither a Certificate of Occupancy nor a food service permit had been issued, Halo Ventures opened for business on November 21, 2002, operating as XO, presenting expressive entertainment and dance performances. That same evening, Wholf issued an administrative order closing XO and posted notices of illegal occupancy. On December 6, 2002, Plaintiffs filed a nine (9) count Verified Complaint seeking declaratory, injunctive and monetary relief.[6] Plaintiffs also filed a motion

---

with any of the activities set forth in subdivisions. *Id.*

6. Plaintiffs' Complaint alleges that Maumee's zoning ordinance is an illegal content-based restraint on freedom of expression in violation of the First and Fourteenth Amendment of the United States Constitution, and Article

I, Section 11 of the Ohio Constitution (Count I); that Maumee's zoning ordinance fails to provide proper procedural safeguards including prompt judicial review and issuance of a license in violation of the First and Fourteenth Amendment of the United States Constitution, and Article I, Section 11 of the Ohio Constitution (Count II); Defendants have re-

for a preliminary injunction, along with a motion for a TRO seeking to prevent Defendants' from enforcing the administrative order and the Ordinance. On June 9, 2002, the Honorable John W. Potter held a hearing on Plaintiffs' motion for a TRO and ordered Defendants "to perform an inspection for the issuance of a certificate of occupancy to plaintiffs and to issue a ruling to plaintiffs regarding their application for a certificate of occupancy forthwith." (Doc. No. 4). The hearing on Plaintiffs' motion for a preliminary injunction was vacated as the parties entered into a stipulation that Maumee would issue a Certificate of Occupancy subject to Plaintiffs operating XO "in accordance with all applicable and relevant zoning laws for the C–2 General Commercial District, including amendments to the City of Maumee Zoning Ordinance enacted on June 3, 2002," until the Court reached the ultimate merits of Plaintiffs' Complaint. (Doc. No. 8).

Plaintiffs assert that they are entitled to summary judgment on the premise that the Ordinance represents a presumptively invalid content-based restriction on expressive conduct, their use of the property is a lawful non-conforming use and the Ordinance constitutes an invalid exercise of the municipal police power. Defendants' cross-motion for summary judgement is based on the same issues.[7]

## DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*

quired information from Plaintiffs not sought from other applicants of Certificates of Occupancy in violation of the right to equal protection under the Fourteenth Amendment to the United States Constitution, and the Ohio Constitution (Count III); Plaintiffs' use of the property is a lawful non-conforming use (Count IV); the Ordinance represents an illegal content-based restraint on freedom of expression in violation of the First, Fifth and Fourteenth Amendment of the United States Constitution, and Article I, Section 11 of the Ohio Constitution (Count V); the Ordinance is invalid because Defendants failed to provide notice and public hearings required by codified ordinances at the time the Ordinance was adopted (Count VI); the Ordinance constitutes an invalid exercise of the municipal police power (Count VII); application of the Ordinance to Plaintiffs has resulted in unrecouped profits in violation of the Fifth and Fourteenth Amendments of the United States Constitution (Count VIII); and Defendants have unconstitutionally applied the Ordinance and abused their authority to grant a Certificate of Occupancy in violation of the First, Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 11 of the Ohio Constitution (Count IX).

7. Defendants argue that this demonstrates Plaintiffs have consolidated the nine (9) counts in their complaint into three claims for purposes of summary judgment. While Plaintiffs do not concede this point, the bases of the parties' motions for summary judgment appear to address Counts I, II, III, IV, V, VII, and IX. Moreover, James Turner ("Turner"), President of Halo Ventures, was present and participated in the May 28, 2002, public hearing during which the Municipal Planning Commission considered the Ordinance prior to its enactment, which would obviate Count VI. Given the Court's disposition of the parties' motions for summary judgment *infra*, Plaintiffs' claims under Count VIII cannot survive.

v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25, 106 S.Ct. 2548. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2541, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. General Motors Corp.,* 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party." *Williams v. Belknap,* 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the

matter,' " *Wiley v. U.S.,* 20 F.3d 222, 227 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams,* 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Atchley v. RK Co.,* 224 F.3d 537, 539 (6th Cir.2000).

## B. Validity of the Ordinance

### 1. Constitutional Validity

■ Plaintiffs' argue that the Ordinance represents a presumptively invalid content-based restriction designed to suppress the presentation of protected expressive conduct. In *City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), the United States Supreme Court stated:

> Being in a "state of full nudity" is not an inherently expressive condition. As we explained in *Barnes,* however, nude dancing of the type at issue here is expressive conduct, although we think it falls only within the outer ambit of the First Amendment's protection. *See Barnes v. Glen Theatre, Inc.,* 501 U.S. [560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) ] (plurality opinion); *Schad v. Mount Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).

> To determine what level of scrutiny applies ... we must decide "whether the

State's regulation is related to the suppression of expression." (citations omitted). If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" standard from [*United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)] for evaluating restrictions on symbolic speech. If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test must be justified under a more demanding standard. (citation omitted).

In *Harris v. Fitchville Township Trs.*, 99 F.Supp.2d 837, 842–43 (N.D.Ohio 2000), this Court, applied the *O'Brien* test to determine the constitutionality of an ordinance designed to regulate public nudity to combat the negative secondary effects due to the presence of adult establishments. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (asserting that zoning ordinances employed to address negative secondary impacts of sexually explicit businesses "are to be reviewed under the standards applicable to 'content-neutral' time, place and manner regulations"). *See also Barnes*, 501 U.S. at 566, 111 S.Ct. 2456 (describing the standards set forth in *O'Brien* as embodying the standards applicable to content-neutral time, place and manner regulations); *DLS v. City of Chattanooga*, 107 F.3d 403, 410 n. 6 (6th Cir. 1997) (noting that the standard for assessing time, place and manner regulations "is materially identical to the *O'Brien* test"). Accordingly, the validity of the Ordinance is analyzed using the four-factor *O'Brien* test, and will:

meet[ ] constitutional muster if it: (a) is within the constitutional power of the government; and (b) furthers an important or substantial government interest that (c) is unrelated to the suppression of free expression; and (d) the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Harris*, 99 F.Supp.2d at 842.

■ In *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 437, 122 S.Ct. 1728, 152 L.Ed.2d 670 (U.S.2002) (plurality opinion) the Supreme Court asserted that a municipality "certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary impacts." A city need not conduct new studies, but may rely on those "already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925. A city may also rely on previous findings in existing jurisprudence. *Renton*, 475 U.S. at 50–51, 106 S.Ct. 925. *See also Erie*, 529 U.S. at 297, 120 S.Ct. 1382. Nevertheless, "a municipality [cannot] get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance." *Alameda Books*, 535 U.S. at 438, 122 S.Ct. 1728.

Plaintiffs assert that Defendants have failed to establish the requisite nexus between adoption of the Ordinance and the circumscription of potential adverse secondary effects associated with adult entertainment.[8] Halo Ventures and BAJA direct the Court to *Lakeland Lounge of Jackson v. City of Jackson, Mississippi*, 973 F.2d 1255 (5th Cir.1992) and *J & B*

---

8. Since this argument focuses on the second prong of *O'Brien*, for purposes of this motion the Court shall presume that Plaintiffs' are not challenging the Ordinance's validity under the other three prongs.

*Entm't v. City of Jackson, Mississippi,* 152 F.3d 362 (5th Cir.1998). In *Lakeland,* the court asserted that preambulatory language contained in a zoning ordinance expressing a purpose to address negative secondary effects may not in and of itself be sufficient to sustain its validity "without specific attention to secondary effects." *Lakeland,* 973 F.2d at 1259. The *Lakeland* court, however, stated:

> Nevertheless, in context here, where (1) the drafters of the ordinance did rely upon studies of secondary effects, (2) a majority of the council members did receive some information about the secondary effects during an open hearing of the planning board, and (3) nothing in the record otherwise suggests impermissible motives on the part of the councilmembers, the language of the preamble shows the city council's awareness of the studies upon which the planning staff relied when framing the ordinance and reflects that a reasonable legislature with constitutional motives could have enacted the ordinance.

*Id.* (citations omitted). *See also Encore Videos, Inc., v. City of San Antonio,* 330 F.3d 288, 291 (5th Cir.2003).

Notably, in *Lakeland,* the court asserted that the city council "could properly place some reliance upon others" to do requisite research, and need not even personally review the studies on which the drafters relied. *Id.* at 1258. *See also Threesome Entm't v. Strittmather,* 4 F.Supp.2d 710, 719 (N.D.Ohio 1998) (asserting that municipal legislators need not review such studies themselves "so long as they receive recommendations from knowledgeable persons") (citing *Lakeland,* at 1258–59).

In *J & B Entm't* the court found that despite preambulatory language in the ordinance, the city could not satisfy the second prong of *O'Brien* as there was an "absence of any evidence suggesting that the city enacted the [o]rdinance with 'spe-

cific attention to secondary effects.'" *J & B Entm't,* 152 F.3d at 374. The *J & B Entm't* court noted that "[t]he record contains neither any deposition testimony nor any affidavit from any [c]ity council member or city employee that might clarify" the rationale for enacting the Ordinance. *Id.* at 373. In fact "[n]o explanation of what specific secondary effects motivated Jackson to enact the [o]rdinance appear[ed] in its text, and the [c]ity [c]ouncil failed to make any specific legislative findings prior to enactment." *Id.* at 374.

In the case *sub judice,* the preamble of the Ordinance unequivocally expresses the City Council's concern over negative secondary effects, especially on children, associated with adult entertainment businesses. In fact, the Preamble of the Ordinance states in pertinent part:

> WHEREAS, documentation regarding the negative secondary impacts of sexually oriented businesses on neighborhoods, property values, and quality of life issues is found in previously published studies for cities including: Denver, Colorado; New York, New York; Indianapolis, Indiana; Springfield, Missouri; Kansas City, Missouri; Boston, Massachusetts; copies of which studies are on file in the City offices; and

> WHEREAS, it is the desire of Council to protect the children of the City of Maumee from exposure to sexually oriented activities and materials.

(Doc. No. 12, Mohler Aff., Ex. 2(B), p. 1).

Moreover, Section 1127(a)(2) of the Code as amended by the Ordinance also reads:

> *Purpose for Regulation of Sexually Oriented Business.* Additional regulations are imposed upon sexually oriented businesses because of the expected secondary impacts on the residential neighborhoods and other specific land uses.

*Id.* at 7.

The affidavits of Shielah McAdams, the Law Director of Maumee, Wholf and

Randy Mielnik, a senior Vice President of Poggemeyer Design Group, the drafters of the Ordinance, demonstrate that they discussed relevant case law from the United States Supreme Court and the Sixth Circuit Court of Appeals, and relied on studies of the secondary effects of adult businesses prepared by other cities.[9] (Doc. No. 21, Ex. 2, McAdam's Aff., ¶ 6; Doc. No. 21, Wholf Aff., Ex. 3, ¶ 2; Doc. No. 21, Mielnik Aff., Ex. 4, ¶¶ 6–7). These affidavits also establish that the focus of the drafters was not to prohibit adult business from operating in Maumee, but to limit the impact of expected negative secondary impacts. (Doc. No. 21, McAdams Aff., ¶ 13; Doc. No. 21, Wholf Aff., ¶ 2; Doc. No. 21, Mielnik Aff., ¶ 8).

Granted, the minutes of the Municipal Planning Commission's meeting of May 28, 2002, do not mention negative secondary impacts, and there is no evidence that any members of the City Council were in attendance. (Doc. No. 12, Feldmeier Aff., Ex. 3(B), p. 11). On the other hand, McAdams asserts that she made a presentation regarding the Ordinance to the Municipal Planning Commission at that meeting where "I identified our primary objective as the protection of children from exposure to the effects of such businesses." (Doc. No. 21, Ex. 2, McAdam's Aff., ¶ 9). She also maintains that the Municipal Planning Commission was informed of the applicable law. In addition, a transcript excerpt of the May 28 meeting shows that concerns over negative secondary impacts associat-

ed with adult establishments were discussed as part of a public hearing on the Ordinance. (Doc. No. 37, Ex. 3, pp. 27–28, 35). Such concerns included the need to minimize the potential effects on residential areas, playgrounds, churches and juveniles. *Id.* at 28.

McAdams also represents that:

The drafters of the [O]rdinance were well aware of the possible negative secondary effects of adult businesses on neighborhoods, property values and quality of life and most particularly, of the effects of exposure to such businesses on juveniles. *Members of the City Council were made aware of these concerns. The primary concern of the Council and my own in determining where adult businesses could operate in the City was to assure that these businesses would be remote from places where minors would be likely to be exposed to them.* (Emphasis added).

(Doc. No. 21, Ex. 2, McAdam's Aff., ¶ 12).

While no member of City Council appears to have been present at the May 28 Municipal Planning Commission meeting, all members were in attendance at the City Council's February 18, 2002, meeting referring the Ordinance to the Municipal Planning Commission for its review and consideration. Significantly, a transcript excerpt of this meeting states:

[I]f this goes to the Planning Commission, *I think it should be related that our, our primary concern is this, these*

---

**9.** Plaintiffs also argue that Defendant cannot show that studies from large cities cited in the Ordinance's preamble, and relied on by the drafters, are relevant to a small municipality such as Maumee. The Court will not linger on this argument other than to note that it is the character of the conduct in a study that determines its relevance. *See Erie,* 529 U.S. at 297, 120 S.Ct. 1382 (maintaining that relevance is based on the character of the adult entertainment; *Renton* (expressing no con-

cern, that Renton, a city of 32,000 persons, could rely on the experience of Seattle and other cities, without reference to a disparity in size)); *Bigg Wolf Disc. Video Movie Sales, Inc. v. Montgomery County, Md.,* 256 F.Supp.2d 385, 394–95 (D.Md.2003) (asserting that under *Erie* the test is whether covered entities "are part of a category reasonably believed to cause some of the secondary effects referred to in [other] studies").

*be placed as far a distance as we can from child day care kids and schools, and that we've ask[ed] Ms. McAdams to look into how, how we can do that and that,* that's what the discussion was in the committee as a whole. (Emphasis added).

(Doc. No. 37, Ex. 2, pp. 3–4).

In addition, the City Council unanimously passed the Ordinance at its June 3 meeting with all members present. (Doc. No. 12, Feldmeier Aff., Ex. 3(C), pp. 1, 3; Doc. No. 37, Ex. 1).

■ Plainly, Defendants have satisfactorily demonstrated that the Ordinance was designed and adopted to further a substantial government interest in accordance with the second prong of *O'Brien*. The City Council reasonably relied on McAdams, Wholf and Mielnik to perform the necessary research and draft the Ordinance, and accepted the recommendation of the Municipal Planning Commission which had, at least in part, relied upon the research and recommendation is of the drafters of the Ordinance. The record demonstrates unambiguously that throughout the process the rationale for adopting the Ordinance was to limit the negative secondary effects associated with adult entertainment establishments, especially the impact on juveniles. It is consistent with the language contained not only in the preamble but also the body of the Ordinance. The Ordinance is a "content-neutral" restriction designed to combat negative secondary effects associated with adult entertainment establishments. Accordingly, Plaintiffs' motion for summary judg-

ment on the premise that the Ordinance is a content-based restriction on protected speech is denied. Defendants' cross-motion for summary judgment on the basis that the Ordinance is a valid content-neutral regulation is granted.[10]

### 2. Lawful Non–Conforming Use

■ Since Halo Ventures submitted an application on May 30, 2002, which was prior to the City Council's enactment of the Ordinance on June 3 (Doc. No. 12, Ex. 1, Sayed Aff., ¶ 2, Doc. No. 1, ¶ 10), Plaintiffs argue that their use of the property is a lawful non-conforming use. Section 1105.09(d) of the Code provides:

Nothing contained in this Zoning Ordinance shall require any change in the plans, construction, size or designated use of a building, structure or part thereof for which a building permit has been granted *or for which a complete application with the necessary plans has been filed with the Zoning Inspector before the enactment of amendment of this Ordinance* and the construction of which according to such permit or plan and specifications shall have been started within ninety days of the enactment of this or Ordinance or such amendment. *If any of the above requirements have not been fulfilled within the time stated above or if any building operations are discontinued for a period of ninety days, any further construction shall be in conformity with the provisions of the Ordinance.* (Emphasis added).

(Doc. No. 12, Mohler Aff., Ex. 2(A), p. 2).

Plaintiffs assert that the Code as it existed on May 30 did not distinguish be-

---

**10.** Defendants also note that *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884 (6th Cir. 2000), cited for the proposition that prior restraints on speech are presumptively invalid, is distinguishable from the case *sub judice*. They assert, and Plaintiffs do not dispute, that *Nightclubs* involved a licensing scheme, and the sole issue on appeal was whether there

were sufficient procedural safeguards. *Id.* at 888–89. In contrast, the Ordinance *sub judice* is a zoning ordinance that allows adult establishments to operate in the M–2 Industrial District, and does not require the businesses or their employees to obtain licenses or permits.

tween sexually oriented businesses and other forms of entertainment allowing bars, taverns, indoor theaters, night clubs, dance floors and similar establishments for the purpose of amusement and entertainment to operate in the C–2 General Commercial District.

While Defendants assert a number of arguments in support of their position that Section 1105.09(d) is inapplicable to the case *sub judice,* the Court need only focus on their argument that Plaintiffs' application was not complete as submitted on May 30.[11] Defendants contend that Halo Ventures' application was not complete having failed to satisfy two conditions for an application to be complete, the approval of submitted plans by a state certified examiner and payment of the filing fee. (Doc. No. 21, Ex. 3, Wholf Aff., ¶ 4). *See Gibson v. City of Oberlin,* 171 Ohio St. 1, 167 N.E.2d 651, 654 (1960) (holding that a property owner has a vested right in the issuance of building permit when all legislative requirements have been satisfied). *See also Harris v. Fitchville Township Trs.,* 154 F.Supp.2d 1182, 1188 (N.D.Ohio 2001). The plans Halo Ventures submitted on May 30 were reviewed by a state certified plans examiner, and returned for corrections. *Id.* In fact, Wholf issued correction letters on June 12 and June 26, 2002 to which Plaintiffs responded.[12] (Doc. No. 21, Wholf Aff., Ex. 3(B) & (C)). Moreover, the filing fee was not paid until July 17. (Doc. No. 21, Ex. 3, Wholf Aff., ¶ 4). A building permit was issued on July 18, 2002. *Id.*

 Plaintiffs assert that "complete" is not defined in the Code, and Wholf's interpretation would render Section

1105.09(d) meaningless by conferring unlimited discretion to delay an application until an Ordinance making the contemplated use unlawful can be enacted. In interpreting legislation, words are given their plain and ordinary meaning absent evidence of legislative intent to the contrary. *Union Rural Elec. Coop., Inc. v. Public Util. Comm'n,* 52 Ohio St.3d 78, 555 N.E.2d 641, 643 (1990); *Coventry Towers, Inc. v. City of Strongsville,* 18 Ohio St.3d 120, 480 N.E.2d 412, 414 (1985). Moreover, "[w]hen the text of a statute contains an undefined term, that term receives its ordinary and natural meaning." *The Limited, Inc. v. Comm'n of Internal Revenue,* 286 F.3d 324, 332 (6th Cir.2002) (citations omitted).

Plaintiffs argue the payment of the filing fee is not mentioned in Section 1105.09(d). They also contend that as a matter of logic payment of any fees is not required until the plans submitted with the application are approved. Accepting these arguments as true, however, demonstrates the validity of Defendants contention that an application is not complete before the accompanying plans are approved by a certified examiner. This is also consistent with the plain and ordinary meaning of the word "complete". "Complete" is defined as "possessing all necessary parts, items, or elements: not lacking anything necessary." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, Unabridged 465 (1986). Since the plans Halo Ventures submitted on May 30 required corrections, they were not complete, and Plaintiffs are not entitled to the benefit of Section 1105.09(d). Thus, Plaintiffs' motion for summary judgment

---

**11.** Defendants also maintain that Plaintiffs are not entitled to the benefit of Section 1105.09(d), having failed to establish a lawful use prior to enactment of the Ordinance, to exhaust administrative remedies or file a mandamus action.

**12.** The Court observes that Wholf issued another correction letter on July 30, 2002. (Doc. No. 21, Wholf Aff., Ex. 3(E)).

on the basis that a lawful non-conforming use of the property had been established prior to enactment of the Ordinance is denied. Defendants' cross-motion for summary judgment premised on the same issue is granted.

### 3. Municipal Police Power

■ Halo Ventures and BAJA assert that the Ordinance constitutes an invalid exercise of the municipal police power by treating adult establishments differently from other commercial establishments without having established the requisite link between the Ordinance and the negative secondary impacts its seeks to circumscribe. In *Goldberg Companies v. Council of the City of Richmond Heights*, 81 Ohio St.3d 207, 690 N.E.2d 510, 514–15 (1998), the Ohio Supreme Court stated:

A municipality or other zoning body is justified under the police power to enact zoning for the public welfare and safety. The powers, not unlimited, need only bear a rational relation to the health, safety, morals or general welfare. *Euclid v. Ambler*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 [ (1926) ].

. . . . .

[A] zoning regulation is presumed to be constitutional unless determined by a court to be clearly arbitrary and unreasonable and without substantial relation to the public health, safety, morals, or general welfare of the community. The burden of proof remains with the party challenging an ordinance's constitutionality, and the standard of proof remains "beyond fair debate." *See Cent. Motors [Corp. v. City of Pepper Pike*, 73 Ohio St.3d 581, 653 N.E.2d 639, 642 (1995) ].

The Court observes that there exists ample precedent for locational requirements that treat adult establishments differently from other commercial entities. *See Renton and Lakeland supra.* In *Napier v. City of Middletown*, No. CA 98–06–

128, 1998 WL 857491, *5, 1998 Ohio App. LEXIS 5994 at *13 (Ohio Ct.App. 12th Dist. Dec. 14, 1998) the court asserted:

[A] municipality is justified by its police power to enact zoning for the public welfare and safety, and [ ] these powers need only bear a rational relation to the health, safety, morals or general welfare. (citations omitted). Further, sexually explicit dancing, which is not obscene does enjoy a limited degree of protection under the First Amendment of the United States Constitution. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). However, such activity is subject to valid time, place, and manner restrictions. *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29.

Although not central to its disposition of an appeal from an administrative zoning decision, the Court finds the *Napier's* discussion instructive.

Given the Court's disposition of the parties' arguments as to the constitutional validity of the Ordinance, *supra*, the Court rejects Plaintiffs' contention that the Ordinance is not rationally related to the public health, safety, morals, or general welfare of Maumee and its residents. The Ordinance is a valid exercise of the municipal police power. Accordingly, Plaintiffs' motion for summary judgment on the basis that the Ordinance is an invalid exercise of the municipal police power is denied. Defendants' cross-motion for summary judgment based on the same issue is granted.

#### C. PLAINTIFFS' MOTION TO REFUND TRO BOND

■ Plaintiffs' move the Court to refund the TRO bond in the amount of $ 500.00, posted in conjunction with the TRO issued on December 9, 2002. Halo Ventures and BAJA argue that a refund of the TRO bond is justified by the Court's Order (Doc. No. 8) adopting the parties'

stipulation and proposed Order. Under the terms of the Order, Defendants granted Plaintiffs a Certificate of Occupancy so long as XO operated in conformance with all applicable and relevant zoning laws for the C–2 General Commercial District, including amendments to the City of Maumee Zoning Ordinance enacted on June 3, 2002. As a result, the need for injunctive relief became moot, and Plaintiffs' withdrew their motion for a preliminary injunction and the hearing was vacated.

Defendants assert that the proceeds should not be refunded and be applied to any award of attorney's fees (or sanctions) imposed as a result of the Court's disposition, discussed *infra*, of Defendants' motion to show cause as to why Plaintiffs should not be held in contempt for violating the aforementioned Order. (Doc. No. 14). This argument is not well taken. Under the terms of the Federal Rules of Civil Procedure, the purpose of the bond is to provide "payment of such costs and damages as may be incurred by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Accordingly, Plaintiffs' motion to refund the TRO bond is granted.

### D. Defendants' Motion for Award of Attorney's Fees in Connection with Contempt Proceeding

■ Defendants' move the Court to award attorney's fees in the amount of $ 4,641.00 in connection with the contempt proceeding initiated as a result of their aforementioned motion to show cause.[13] The Court held a hearing and issued a Amended Order granting Defendants' motion which stated:

> Defendants' motion is granted; Plaintiffs are found by clear and convincing evidence to be in contempt of this Court's prior order. While the evidence adduced at the hearing failed to demonstrate an intent to violate said order, intent is not relevant in this civil contempt action. Further, it is clear that under the present configuration of the facility, compliance is not likely to occur. Good faith attempts to comply with the Court's prior Order is not a defense in a civil action.

(Doc. No. 25).

■ Plaintiffs argue that the sanctions the Court imposed as a result of finding them in contempt, including the inability to use certain areas of XO so long as they remained closed areas and paying Maumee almost $ 8500.00 for monitoring Plaintiffs' operations, are sufficient and obviate the need for further sanctions. "[An] award of attorney's fees is appropriate for civil contempt in situations where court orders have been violated." *McMahan v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000). *See also Redken Lab., Inc. v. Levin*, 843 F.2d 226, 230 (6th Cir.1988) (noting that propriety of awarding attorney's fees in connection with civil contempt proceedings). Thus, Defendants' motion for attorney's fees in the amount of $ 4,641.00 is granted.

### Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment (Doc. No. 12) is denied. Defendant's cross-motion for summary judgment (Doc. No. 20) on the same issues is granted. Plaintiffs' motion to refund TRO bond (Doc. No. 13) is granted. Defendants' motion for award of attorney's fees in connection with contempt proceeding (Doc. No. 26) is also granted.

IT IS SO ORDERED.

13. Defendants have supplied supporting data.

(Doc. No. 28).